CENTRAL ALABAMA FAIR HOUSING CENTER, INC., et al., Plaintiffs-Appellants,

v.

LOWDER REALTY CO., INC., et al., Defendants-Appellees.

No. 99-6133.

United States Court of Appeals,

Eleventh Circuit.

Dec. 21, 2000.

Appeals from the United States District Court for the Middle District of Alabama. (No. 97-00474-CV-A-N), N. Harold Albritton, III, Chief Judge.

Before TJOFLAT, MARCUS and KRAVITCH, Circuit Judges.

MARCUS, Circuit Judge:

Plaintiffs Cynthia Foster, Denise Frazier, Barbara Gill-Smith, Brenda Smith, Ezell Smith, and the Central Alabama Fair Housing Center appeal a final jury verdict in favor of defendants on their housing discrimination claims. Plaintiffs present two distinct issues on appeal. First, the individual plaintiffs argue that the district court erred by finding a prima facie case of racial discrimination in their use of a peremptory challenge at trial, and subsequently denying their request to strike the juror in question. Second, the Central Alabama Fair Housing Center argues that the district court erred in instructing the jury that the Center's right to recover was contingent upon a finding that the defendants unlawfully discriminated against the individual plaintiffs. We conclude that the district court committed reversible error as to both issues, vacate the jury verdict, and remand for a new trial.

I.

The individual plaintiffs are six African-Americans who sought to purchase homes in Montgomery, Alabama. They allege that the defendant real estate companies, Lowder Realty Co., Inc., Lowder New Homes, Inc., and Lowder New Homes Sales, Inc., intentionally steered them away from predominantly white neighborhoods and toward predominantly African-American neighborhoods. Plaintiffs allege violations of the Fair Housing Act of 1968, 42 U.S.C. § 3601, *et seq.,* and two provisions of the Civil Rights Act of 1866 (42 U.S.C. §§ 1981 and 1982).

A.    *Facts Relating to Denial of Peremptory Challenge*

On December 7, 1998, the U.S. District Court for the Middle District of Alabama called a venire panel for service in a term of civil jury court. This action was the only case to be tried during the term. Three

days preceding the calling of the venire, the Jury Commissioner had distributed to the parties copies of the list of jurors on the venire and questionnaires completed by the venire members.

After the venire was sworn by the clerk, the district court conducted voir dire and allowed attorneys for the parties to ask questions that further explored answers given by the individual venire members. After voir dire was completed, the district court excused four jurors who asserted that for personal reasons it would be impossible or an extreme hardship to serve on the jury. The court then heard the parties' challenges for cause. Plaintiffs made challenges for cause against five jurors, all white, one of which was granted. Defendants challenged two jurors for cause, both of whom were struck by the court.

The court then stated that it would empanel eight jurors and permitted each party three peremptory challenges. Of the prospective jurors—the first fourteen remaining on the venire—eleven were white and three were black. The parties exercised their peremptory strikes by concurrently writing down all of their requested strikes and returning them to the clerk. Plaintiffs and defendants each utilized two of their three allotted peremptory strikes.

Plaintiffs then asserted that the defendants, who used their two strikes to challenge African-American jurors (# 7 and # 8), exercised their strikes on the basis of race in violation of the Equal Protection Clause. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court found that a *prima facie* case was established because "defendants' only strikes were black jurors and ... no black jurors remained on the panel as constituted." Although defense counsel pointed out that one African-American juror had not been struck and would serve even if the parties' peremptory strikes were upheld, the district court nevertheless required the defendants to give race-neutral reasons for their strikes. Defense counsel stated that Juror # 7 was struck because (1) she was grimacing, frowning, and staring straight ahead; (2) defendants' jury consultant observed that she was sleeping; and (3) one of the defense lawyers always struck people from Lowndes County. Defense counsel said that Juror # 8 was struck on the grounds that (1) she was grimacing and frowning; (2) her arms were crossed; (3) the jury consultant observed that she was sleeping; (4) she was a "social worker type"; and (5) one of the defense lawyers always struck people from Bullock County. The district court found that these explanations could be a cover for race-based reasons, and upheld plaintiffs' *Batson* challenge as to both jurors. The jurors were then placed on the jury empaneled to hear the case.

Defendants then asserted that plaintiffs had engaged in intentional discrimination when exercising their two strikes against Jurors # 5 and # 9. Defendant counsel objected on the ground that both jurors were

white males and neither had made statements during voir dire that would justify striking them but for their race. The district court found a *prima facie* case of racial striking, stating only "[b]oth challenges having been used against white jurors, I find there is a prima facie case of racial striking and I will require the plaintiffs to show race neutral reasons." When plaintiffs exercised their peremptory challenges, eleven of the fourteen prospective jurors were white.

Plaintiffs then provided race neutral reasons for striking the two jurors. As to Juror # 5, they stated that they struck him because he belonged to the NRA. The district court found this reason to be race neutral, and denied defendants' challenge to plaintiffs' strike of Juror # 5.

Plaintiffs then presented five separate reasons for striking Juror # 9: (1) he held a bank account with Colonial Bank, a company within the same corporate family as several of the defendant corporations; (2) he owned commercial rental property; (3) his immediate family members belonged to various clubs and organizations about which the district court had questioned the venire; (4) his status as an alcoholic, as revealed on the court's juror questionnaire form, rendered him more susceptible to any stress associated with jury service in a two-week civil rights trial; and (5) the stress of serving on a jury could have been further exacerbated by the fact that he lived 80 or 90 miles from the courthouse. Each of the reasons offered by the plaintiffs was based on information contained in the record, including the jury questionnaires completed by the venire members.

After plaintiffs finished explaining why they struck Juror # 9, the district court failed to state whether it considered plaintiffs' reasons to be race-neutral but instead immediately presented defendants with the opportunity to challenge the sufficiency of those reasons. In response, defense counsel stated that they believed Juror # 9 had not had a drink since 1991, that he rented commercial and not residential property, and that they did not believe in striking a juror because he was an alcoholic. The district court then concluded that ownership of a warehouse had nothing to do with the case and that being a recovering alcoholic and living 90 miles from the courthouse were not legitimate reasons for striking a juror and could be a cover for race-based reasons. With no further discussion of these three reasons proffered by plaintiffs and no discussion whatsoever of plaintiffs' other two proffered reasons, the district court sustained defendants' challenge to plaintiffs' attempted peremptory strike. The district court placed Juror # 9 on the jury of eight that was empaneled to hear the case and the remaining venire members were excused. Juror # 9 ultimately served on the jury that rendered a verdict and became the jury foreperson.

B.      *Facts Relating to Center's Right to Recover Damages*

The Central Alabama Fair Housing Center is a nonprofit corporation whose mission is eliminating racial discrimination in housing. It receives and investigates complaints of discrimination in the Montgomery area, provides counseling to persons who believe they have been discriminated against, and educates realtors and the public about federal fair housing law. In connection with its investigatory role, the Center goes to court seeking redress for violations of housing laws.

At trial, the Center presented the following evidence in support of its claim. In response to complaints of racial steering it had received, the Center conducted a series of tests, sending two teams of white and black employees to two different Lowder realtors, Juliette Stuckey and Debra Whitehouse. White tester Jennifer Woods recounted her testing experience for the jury. Woods testified that when the team of white testers contacted Stuckey, they asked to see four houses in racially mixed or black neighborhoods. Rather than initially showing them the older houses they had asked to see, however, Stuckey showed them a new house in a predominantly white area. When she did show them the first of the houses they asked to view, she made a number of comments about the neighborhood, offering her opinion that it was "not a good area" and that the white testers would not want to live there because there were "too many of the other kind."

Woods further testified that after the couple had viewed the first house they had requested to see, Stuckey reiterated, "I would hate to see you buy here, I'll be honest with you. It's just not a good area. This used to be the nicest area 40 years ago." Then, pointing to an apartment complex nearby, Stuckey said, "That's nothing but blacks over there in all those apartments." As they returned to the Lowder office, driving through predominantly white neighborhoods, Stuckey remarked how nice the areas were.

The Center also presented testimony from black testers Ethica Gilbert and Gary Lewis, who described a different experience with Stuckey. Stuckey, they said, first tried to discourage them from spending as much money as they wanted to spend on a house, although they, like the white testers, claimed to be prequalified in the house's price range. Gilbert testified that Stuckey did not take them to view any new houses, instead showing them older houses in mixed or predominantly black neighborhoods. She offered them no cautions about the poor quality of these neighborhoods. She did not drive them through the predominantly white east Montgomery neighborhoods or comment on the "niceness" of those areas.

The Center also put on testimony from paired testers who had consulted with Lowder realtor Debra Whitehouse. Drew Colfax, who is white, and Reginald Bowie, who is black, each told Whitehouse that he wanted to spent about $75,000, and that he was interested in a particular house on Banyan Street, in a predominantly black neighborhood.

Colfax testified that when Whitehouse showed the Banyan Street house to him, she rushed him through, remarking that the house's storm windows added "an extra layer of security." She suggested that he find a house in Prattville, a white bedroom community, or off Vaughn Road, a white area. During her second meeting with the white tester Colfax, Whitehouse showed him houses of her choosing in white neighborhoods which she described in favorable terms such as "easy to resell," "a good place to raise a family," "a very nice area," or "my parents live near here."

By contrast, according to black tester Bowie, when Whitehouse showed the same Banyan Street house to him, she pointed out the good features of the neighborhood, commenting that it had a lot of space for the price. She did not mention the storm windows or any other security feature. She then showed him other houses in predominantly black neighborhoods, commenting on their good features and what he could do to fix them up. When she finally showed him a house in a white neighborhood, it was above his stated price range.

The Center offered this evidence to prove that Stuckey and Whitehouse engaged in racial steering by discouraging blacks from looking in white neighborhoods and discouraging whites from looking in black neighborhoods. The tests that were the subject of this live testimony were conducted by the Center as part of its investigation of the reports of racial steering it had received.

The Center's executive director, Faith Cooper, testified that when the Center learned through its testers that Lowder realtors were engaging in racial steering, the Center realized that it would have to divert resources to combat Lowder's activities. Lowder's discrimination, she testified, frustrated the mission of the Center to ensure that Montgomery citizens have access to the housing of their choice.

Cooper testified that, based upon her records, the Center diverted resources that it otherwise would have had available for various activities in its 29-county service area to its racial steering programs in Montgomery. She also testified that the Center's activities related to other kinds of discrimination, such as family status, disability, and discrimination in mortgage lending, were curtailed as the Center attempted to counteract the effects of the defendants' racial steering programs. The Center undertook counseling, testing, litigation, outreach, and education activities in this regard. Cooper testified that as of June 1997, the Center had spent $17,866.06 on these activities and that the Center's expenses continued to rise.

Following the presentation of this evidence, the judge instructed the jury in these terms:

> If you find that one or more defendants or their agents violated the rights of the individual plaintiffs: Cynthia Foster, Brenda Smith, Barbara Gill-Smith, Ezell Smith, or Denise Frazier, then you may also consider the damages to be awarded as compensation to the Central Alabama Fair Housing Center.

If the [Center] has suffered injury because of racial discrimination on the part of the defendants, the [Center] is entitled to recover damages for the costs which it has incurred solely in connection with this litigation against the defendants. You must find that any damage claimed by the [Center] was caused by a violation of the discrimination statutes at issue in this case by the Lowder defendants and that the damages were incurred in response to those violations.

The Center objected to the portion of this charge that made a finding for the Center contingent upon the jury's having first concluded that one (or all) of the individual plaintiffs was entitled to a favorable verdict. The Center's counsel argued that "the liability of the defendant as against individual plaintiffs is not a necessary prerequisite to a finding of damages of the [Center].... There is evidence that has been presented in this trial that could support damages for the [Center] above and beyond that which would support claims for individual plaintiffs.... The fact that [an individual's] claim [may] be legally precluded should not preclude damages to the Center." The trial court overruled the objection.

In conjunction with the jury charge, the court prepared a verdict form containing special interrogatories to guide the jury. Questions (1)(a) and (b) of the court's verdict form asked the jury whether it found that the defendants intentionally discriminated against plaintiff Cynthia Foster and whether the defendants had made a false representation to her. A "yes" answer to (1)(a) or (b) would indicate a finding of liability in favor of Foster. Likewise, a "yes" answer to parts (4)(a), (b), or (c) would indicate a finding of liability in favor of plaintiff Gill-Smith, a "yes" answer to question 8 would indicate a finding that the defendant were liable to Frazier, and a "yes" answer to question (11)(a) would indicate that the defendants were liable to Smith. Having made explicit that a "yes" answer to interrogatories (1)(a) or (b), 4(a), (b) or (c), 8, and/or 11(a) would mean that a particular individual prevailed on his or her claim, the court then directed the jury, in interrogatory 14:

You need to answer this question only if you have answered "yes" to question (1)(a) or (b), question 4(a)(b) or (c), question 8 or question 11(a) above. If you did, do you find by a preponderance of the evidence that the Central Alabama Fair Housing Center suffered injury as a result of intentional discrimination on the part of the Defendants?

_____ yes _____ no

If you answered "no" to question (14), go to "Part Six—liability of James K. Lowder." If you answered "yes", enter the amount of damages that the Plaintiffs have shown by a preponderance of the evidence if appropriate to compensate the [Center.]

Having earlier objected to the jury instruction that made recovery by an individual plaintiff a condition precedent to the Center's recovery, counsel did not make a renewed objection to the special interrogatories. The jury returned a verdict omitting the Center's claims because it did not find for the individual plaintiffs on their claims.

II.

The standard of review is clear. We review the district court's resolution of a *Batson* challenge under the clearly erroneous standard. *See, e.g., United States v. Blackman,* 66 F.3d 1572, 1575 (11th Cir.1995). As part of that review, we give "great deference to the district court's finding as to the existence of a prima facie case." *United States v. Stewart,* 65 F.3d 918, 923 (11th Cir.1995). "Once past the prima facie case step, the district court's determination concerning the actual motivation behind each challenged strike amounts to pure fact-finding, and for that reason we will reverse the district court's determination only if it is clearly erroneous." *Id.*

With respect to jury instructions properly challenged below, we review "de novo to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party." *United States v. Grigsby,* 111 F.3d 806, 814 (11th Cir.1997) (citing *United States v. Chandler,* 996 F.2d 1073, 1085 (11th Cir.1993)). Our task is "to determine whether the instructions objected to below create 'a substantial and ineradicable doubt' that the jury has been misled in its deliberations." *Wood v. Spring Hill College,* 978 F.2d 1214, 1218 (11th Cir.1992). The phrasing of special jury interrogatories is reviewed under an abuse of discretion standard; reversal is warranted where the interrogatories have "the potential for confusing or misleading the jury." *Petes v. Hayes,* 664 F.2d 523, 525 (5th Cir.1981).

III.

A.

We turn first to the individual plaintiffs' argument that the district court erred by allowing defendants' *Batson* challenge to white Juror # 9. The Supreme Court has established a three-part test for resolving Equal Protection challenges, under *Batson* and its progeny, to a party's attempted peremptory strike. First, the party challenging the peremptory strike must establish a *prima facie* case of discrimination. *Batson,* 476 U.S. at 96, 106 S.Ct. 1712. Second, if the court finds that a *prima facie* case of discrimination is proven, the party making the peremptory strike is afforded the opportunity to articulate a non-discriminatory explanation for the strike. *Id.* at 96-98, 106 S.Ct. 1712. Third, if a non-discriminatory reason is offered, the court must determine whether the party challenging the strike has met its burden of proving the existence of purposeful discrimination. *Id.; see also Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

As this framework makes clear, the establishment of a *prima facie* case is an absolute precondition to further inquiry into the motivation behind the challenged strike. Indeed, we have stressed that "[n]o party

challenging the opposing party's use of a peremptory strike—whether that party be the government, a criminal defendant, or a civil litigant—is entitled to an explanation for that strike, much less to have it disallowed, unless and until a prima facie showing of racial discrimination is made." *United States v. Stewart,* 65 F.3d 918, 925 (11th Cir.1995). Thus, a district court may not require an explanation for a peremptory strike unless and until it satisfies itself that a *prima facie* case has been established. Similarly on appeal, "unless it concludes that a prima facie showing was made, an appellate court should neither reverse a trial court's action refusing to disallow challenged strikes, nor should it affirm a trial court's action disallowing strikes." *Id.* Accordingly, the threshold task in considering a *Batson* challenge, for a district court as well as this Court, is to determine whether a *prima facie* case was established. If the answer is no, then the inquiry ceases, and the challenge should be denied.

In order to establish a *prima facie* case of racially discriminatory use of peremptory strikes, the party objecting to a peremptory strike bears the burden of establishing facts sufficient to support an inference of racial discrimination. *See, e.g., Batson,* 476 U.S. at 96, 106 S.Ct. 1712; *Dudley v. Wal-Mart Stores, Inc.,* 166 F.3d 1317, 1321 (11th Cir.1999). The trial court must examine whether the party has shown sufficient "relevant circumstances" to raise an inference that the opposing party seeks to exclude the prospective juror on account of race. In *Batson,* the Supreme Court offered two examples of circumstances that may support such an inference: (1) engaging in a "pattern" of strikes against venire members of one race, or (2) questions or statements during voir dire or in exercising challenges that suggest a discriminatory purpose. *See* 476 U.S. at 97, 106 S.Ct. 1712.

Drawing on these examples, the defendants in this case pointed to two facts in support of their claim of discrimination: (1) plaintiffs' two peremptory strikes were used to strike white male jurors, thereby establishing a "pattern" of striking members of one race; and (2) neither of those white jurors had any made statements during voir dire that would justify striking them but for their race. The trial judge found a *prima facie* case of racial striking based only on the fact that plaintiffs had struck two white males. As a matter of law, this evidence is inadequate to raise an inference of racial discrimination sufficient to establish a prima facie case.

To begin with, the mere fact of striking a juror or a set of jurors of a particular race does not necessarily create an inference of racial discrimination. The number of persons of a particular race struck takes on meaning *only* when coupled with other information such as the racial composition of the venire, the

race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck. This Court has held that "[i]n making out a *prima facie* case, 'the defendant must point to more than the bare fact of the removal of certain venire persons and the absence of an obvious valid reason for the removal'." *United States v. Allison,* 908 F.2d 1531, 1538 (11th Cir.1990). A party advancing a *Batson* argument ordinarily should "come forward with facts, not just numbers alone." *United States v. Bergodere,* 40 F.3d 512, 516 (1st Cir.1994). Consequently, a showing that a party used its authorized peremptory strikes against jurors of one race does not, standing alone, establish a *prima facie* case of discrimination.

That said, an inference of discrimination based on the number of jurors of a particular race may arise where there is a substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury. *See, e.g., United States v. Alvarado,* 923 F.2d 253, 255 (2d Cir.1991) ("Only a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination."); *United States v. David,* 662 F.Supp. 244, 246 (N.D.Ga.1987) (finding that "[a]though the percentage of black jurors struck from a jury panel might establish a prima facie case in some instances, here it does not because ... the number of black persons on the regular panel was small."). Thus, the number of jurors of one race struck by the challenged party may be sufficient by itself to establish a *prima facie* case where a party strikes all or nearly all of the members of one race on a venire. *See United States v. Williams,* 936 F.2d 1243, 1246 (11th Cir.1991) (finding a prima facie case where prosecutor struck all of the African-American members of the venire).

In this case, plaintiffs' rate of challenging white jurors was not significantly higher than the percentage representation of white jurors on the venire. The composition of the venire was 80% white. With their two strikes, plaintiffs' rate of challenging white jurors could have only been 0% (if they struck two blacks), 50% (if they struck one black and one white), or 100% (if they struck two whites). Consequently, the 100% rate actually utilized by plaintiffs was actually the rate that most closely approximated the percentage of whites among the prospective jurors. Moreover, the probability of striking two white jurors was significantly higher than the probability of striking either a juror of each race or two black jurors. Defendants do not dispute that, if plaintiffs had exercised their two peremptories in a completely random manner, there was a 60% probability that the strikes would have been exercised against two white jurors.[1]

---

[1]Plaintiffs calculate the probability of striking white jurors in the following manner: the probability of the first strike being against a white juror is equal to the number of white jurors on the panel divided by the total number of jurors on the panel—11 divided by 14. The probability of the second strike being

In addition, not all, nearly all, or even *most* whites on the panel were struck by plaintiffs. After resolving the challenges for cause, only the first fourteen jurors could potentially serve on the panel. Of those fourteen jurors, three were black and eleven were white. Accordingly, after plaintiff struck two white jurors, nine white venire persons remained who could potentially serve on the jury.

Finally, plaintiffs only used two of the three peremptory strikes they were allotted. This Court has held that the unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a *prima facie* case of discrimination in the peremptory striking of jurors of that race. *See, e.g., United States v. Puentes,* 50 F.3d 1567, 1578 (11th Cir.1995) ("Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."); *United States v. Jiminez,* 983 F.2d 1020, 1023 (11th Cir.1993) (noting that the presence of blacks on the jury was "significant" in reviewing the district court's denial of a *Batson* challenge); *United States v. Allison,* 908 F.2d 1531, 1537 (11th Cir.1990) (finding that the unchallenged presence of blacks on a jury undercuts the inference of impermissible discrimination that might arise solely from striking other black prospective jurors); *United States v. Dennis,* 804 F.2d 1208, 1211 (11th Cir.1986) ("[T]he unchallenged presence of two blacks on the jury undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used three of the four peremptory challenges he exercised to strike blacks from the panel of potential jurors and alternates."). Thus, viewed in context, the fact that plaintiffs' two exercised strikes were against white jurors does not establish a *prima facie* case.

The fact that the two white jurors did not (from the perspective of the defendants) say anything during voir dire that would justify striking them hardly establishes a *prima facie* case.[2] The more pertinent question is whether plaintiffs' counsel said anything during voir dire arguably indicating a discriminatory purpose. *Batson* instructs that a trial court judge may consider whether counsel's questions and statements during voir dire support a finding of discriminatory purpose. But the mere fact that plaintiffs' counsel decided to exercise peremptory challenges against jurors who had not been extensively questioned during voir dire does not establish a discriminatory purpose. *See United States v. Allison,* 908 F.2d 1531, 1538 (11th

---

exercised against a white juror is equal to the number of white jurors on the panel after the first strike has been exercised divided by the total number of jurors on the panel after the first strike has been exercised—10 divided by 13. The probability of both strikes being exercised against whites is the product of the two probabilities.

[2]The district court apparently did not give any weight to this argument.

Cir.1990) ("[i]n making out a prima facie case, 'the defendant must point to more than the bare fact of the removal of certain venire persons and the absence of an obvious valid reason for the removal.' ") (quoting *United States v. Young-Bey,* 893 F.2d 178, 179 (8th Cir.1990)).

Defendants' argument misapprehends the distinction between challenges for cause and peremptory challenges. Peremptory challenges allow parties to remove jurors who are perceived as having some potential of being partial. Indeed, "[b]y its very nature, the peremptory challenge is a tool that may be wielded in a highly subjective and seemingly arbitrary fashion, based upon mere impressions and hunches." *United States v. Annigoni,* 96 F.3d 1132, 1144 (9th Cir.1996). Especially given that eleven of the 14 jurors were white, the fact that Plaintiffs attempted to strike two white jurors whom they had not extensively questioned during voir dire is simply insufficient to establish a *prima facie* case. This is particularly true since the venire members had all filled out questionnaires preceding jury selection, making it likely that one or both sides would attempt to strike jurors based solely on their answers on the questionnaire.

We therefore conclude that the district court clearly erred in finding that defendants had met their burden of establishing a *prima facie* case of a *Batson* violation. Under our decision in *Stewart,* a *prima facie* case plainly is a prerequisite to granting a *Batson* challenge. Because no *prima facie* case was established here, the district court should not have asked the plaintiffs to offer race-neutral reasons justifying their strikes, and our analysis ceases without consideration of the reasons eventually proffered by the plaintiffs. Moreover, where as here a district court allows a *Batson* challenge in the absence of a *prima facie* case, the error is not harmless, and the case must be remanded for a new trial.[3] We therefore reverse the district court's action disallowing the plaintiffs' peremptory strike of Juror # 9, and remand for a new trial.

## B.

We turn next to the Center's argument that its ability to recover damages should not be contingent on the individual plaintiffs' prevailing on their claims. Defendants seemingly acknowledge, as they must, that

---

[3]*See United States v. McFerron,* 163 F.3d 952, 955 (6th Cir.1998) (noting that the suggestion that the erroneous denial of a peremptory challenge should be subjected to a harmless error test has been "resoundingly rejected by every circuit court that has considered the issue."); *see also Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (holding that "[t]he denial or impairment of the right [of peremptory challenge] is reversible error ...."), *overruled on other grounds by Batson; United States v. Broussard,* 987 F.2d 215, 221 (5th Cir.1993) ("The denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice."), *abrogated on other grounds by J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.,* 908 F.2d 1363, 1369 (7th Cir.1990) (holding that "[i]t is reversible error to deny a party to a jury trial the peremptory challenges to which the rules of procedure entitle him...."); *United States v. Ruuska,* 883 F.2d 262, 268 (3d Cir.1989) (stating the automatic reversal rule of *Swain* ).

a fair housing organization has standing to recover certain types of damages on its own to the extent it suffers injury proximately caused by the defendant's unlawful conduct. *See, e.g., Arkansas Acorn Fair Housing, Inc. v. Greystone Development, Ltd., Co.,* 160 F.3d 433, 434 (8th Cir.1998) ("the deflection of an organization's monetary and human resources from counseling or educational programs to legal efforts aimed at combating discrimination, such as monitoring and investigation, is itself sufficient to constitute an actual injury [where] traceable to some act of the defendant"); *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 904-05 (2d Cir.1993); *Hooker v. Weathers,* 990 F.2d 913, 915 (6th Cir.1993). Indeed, the district court rejected defendants' motion to dismiss and their motion for summary judgment based on lack of standing. Defendants argue, however, that a fair housing organization cannot recover damages when the only unlawful conduct proved at trial was suffered by the organization's own agents. Thus, defendants assert, the Center cannot seek damages based on injuries traceable to their unlawful conduct toward the Center's own testers. We disagree, and conclude that the district court's jury instruction—which indicated that the Center could recover only if one of the individual plaintiffs prevailed—constitutes reversible error.

There can be no debate that under the Supreme Court's decision in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), a fair housing organization has standing to sue when the defendant's racial steering practices impair the organization's ability to provide housing counseling and referral services. In *Havens,* three individual plaintiffs and testers, along with an organization called HOME, a nonprofit corporation whose purpose was to "make equal opportunity in housing a reality in the Richmond Metropolitan area," sued for violation of the Fair Housing Act. *Id.* at 368, 102 S.Ct. 1114. HOME's activities included investigation and referral of complaints concerning housing discrimination. *Id.* HOME alleged broadly that defendant Havens Realty Corp.'s steering practices had frustrated HOME's activities as to housing counseling and referral services, with a consequent drain on resources. Specifically, HOME attempted to bring suit against Havens on its own behalf because it "has been frustrated by the defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379, 102 S.Ct. 1114. HOME had employed two "tester plaintiffs" to determine whether Havens engaged in racial steering.

Analyzing HOME's claim in the context of a motion to dismiss, the court first emphasized that Congress intended for § 812 of the Fair Housing Act, the racial steering provisions, to extend to the "full

limits of Article III." *Id.* at 372, 102 S.Ct. 1114. Thus, said the Court, federal courts have no authority to erect "prudential" barriers to standing in suits brought under Section 812. *Id.* The sole requirement in bringing suit under Section 812 is that "the plaintiff allege that as a result of the defendant's action [it] has suffered a distinct and palpable injury." *Id.*

The Court then concluded that HOME had established an injury-in-fact sufficient to confer standing. The Court did not find that HOME's ability to sue was in any way contingent upon the standing of any of the individual plaintiffs, but rather that fair housing organizations *"are entitled to sue on their own behalf for injuries they have sustained ... in their own right."* *Id.* at 378-79, 102 S.Ct. 1114 (emphasis added). Specifically, the Court stated:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities with the consequent drain on the organization's resources, constitutes far more than simply a setback to the organization's abstract social interests.

*Id.* at 379, 102 S.Ct. 1114. Without reference to the validity of the claims of any of the other plaintiffs in the suit, the Court held that HOME's allegations were sufficient to prove injury and remanded for further proceedings.

Defendants do not now contend that the Center lacks standing to recover at least some of the kinds of damages that it seeks in this case (allegedly based upon the diversion of its resources and the frustration of its mission). Rather, defendants contend that under *Havens* the Center may only recover such damages to the extent they are caused by acts of discrimination directed toward persons *other than* the Center's own testers. Accordingly, say the defendants, if none of the plaintiffs can establish a claim for unlawful discrimination, and the only cause of the alleged diversion of resources was discrimination toward the testers, it follows that the Center cannot recover.

While this Court had never addressed the issue, a majority of circuits to do so have concluded, based upon *Havens,* that a fair housing organization may recover in its own right for the diversion of its resources to combat the defendant's discrimination toward its testers. In *Village of Bellwood v. Dwivedi,* 895 F.2d 1521 (7th Cir.1990), the Seventh Circuit considered a case brought by 28 testers, a municipality, and a fair housing center against a real estate brokerage firm and two of its employees alleging discriminatory practices in violation of the Fair Housing Act. The organization sought damages based solely on the effects of the defendant's unlawful acts toward its testers. The jury found for the plaintiffs, and the Seventh Circuit

affirmed. In so doing, it held:

> *Havens* makes clear ... that the only injury which must be shown to confer standing on a fair housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination. These are opportunity costs of discrimination since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination.

*Id.* at 1526. The court did not suggest that the organization's right to recovery was in any way limited by the fact that the defendant's unlawful acts related only to the testers.

Similarly, in *Cabrera v. Jakabovitz,* 24 F.3d 372 (2d Cir.1994), the Second Circuit allowed a fair housing organization to recover damages based on the defendants' unlawful discrimination toward its testers. In *Cabrera,* a fair housing center, acting on its own initiative rather than in response to a specific complaint, sent testers to investigate racial steering claims in the renting of properties in New York City. Its testers were in fact racially steered and the center successfully recovered damages under the Fair Housing Act and §§ 1981 and 1982 based entirely on the experiences of its testers. *Id.* at 379-80.

The Third Circuit has likewise suggested that a fair housing organization may recover damages based on the experiences of its testers. In *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers,* 141 F.3d 71 (3rd Cir.1998), a nonprofit fair housing organization brought an action against newspapers, publishers, and classified advertisement editors, alleging that the publication of allegedly discriminatory advertisements violated the Fair Housing Act. The organization made three damage claims: (1) frustration of its mission; (2) diversion of resources to measures designed to correct the harm allegedly caused by the discriminatory housing; and (3) diversion of resources to litigation. *Id.* at 73. With respect to the organization's allegations of frustration of mission and diversion of resources, a majority of the court found that the organization failed to meet its burden of proving a causal link between the alleged wrongdoing and the injury. *Id.* at 76. However, the court expressly recognized that these damage claims, if properly proven, could support an organization's standing to bring suit. The court specifically emphasized that "[w]e do not ... impose a bona fide home-seeker requirement." *Id.* at 77 n. 3.[4]

Defendants contend that these decisions are incorrect to the extent they concern what occurs at trial,

---

[4]The Third Circuit did hold, with respect to the organization's third damages claim, that "litigation expenses alone do not constitute damage sufficient to support standing." *Id.* at 79. It reasoned that merely devoting funds to support a lawsuit will not suffice to establish an Article III injury. The problem there, however, was that the organization failed to show that it had devoted time and resources to any "legal" efforts *short* of pursuing the litigation at hand (such as investigation). *Id.* at 80 n. 7. Looking at the record here, by contrast, the Center's potential recovery may well encompass more than litigation expenses for the suit at hand. Precisely what kinds of damages may properly be recovered by the Center depends on the nature of proof at trial and is not an issue before us today.

and that permitting an organization to recover damages based solely on discrimination toward its testers is tantamount to allowing an organization to manufacture its own lawsuit simply in order to recover the costs of bringing suit. Defendants rely heavily on the D.C. Circuit's decision in *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.,* 28 F.3d 1268 (D.C.Cir.1994). In *BMC Marketing,* a fair employment organization alleged that the defendant ("BMC") had interfered with its testing, community outreach, public education, counseling, and research projects and had required the organization to expend resources to counteract BMC's alleged discrimination, including employing testers. The court held that the Fair Employment Council had standing only if the discriminatory actions taken by BMC "perceptibly impaired" the organization's programs, by increasing the number of people in need of counseling or by making it harder for minorities to find jobs in greater Washington. *Id.* at 1276. The court expressly rejected the notion that "the mere expense of testing BMC constitutes 'injury in fact' fairly traceable to BMC's conduct." *Id.* The court found that funds the Council spent on testing BMC "resulted not from any actions taken by BMC, but rather from the Council's own budgetary choices." *Id.* The court interpreted *Havens* as not supporting such a "self-referential injury ... [where] the time and money that plaintiffs spend in bringing suit against a defendant would itself constitute a sufficient 'injury in fact,' a circular position that would effectively abolish the requirement altogether." *Id.* at 1277. It acknowledged that *Havens* contemplated standing based upon a "drain on the organization's resources," but it interpreted this statement as referring to the "drain that apparently sprang from the organization's need to counter the defendants' assertedly illegal practices, ... simply another manifestation of the injury that those practices had inflicted upon the organization's noneconomic interest in encouraging open housing...." *Id.* (internal quotation marks omitted). The court therefore concluded that the organization would have standing based on BMC's actions "against bona fide employment candidates, but not from BMC's actions against the testers." *Id.*

We are unpersuaded that *BMC Marketing* should be read to apply to this case, and conclude instead that the reasoning of the Seventh and Second Circuits provides a better approach on this record. In particular, we think the underlying logic of *Havens* is at odds with the D.C. Circuit's analysis, at least as applied to these unique facts.[5] The *Havens* court regarded the identification and combating of discrimination as a "concrete

---

[5]We note as well that one of the key premises of the D.C. Circuit's opinion—the notion that the testers did not have individual standing under the Fair Housing Act and § 1982—is at odds with our precedent. *See Watts v. Boyd Properties,* 758 F.2d 1482, 1485 (11th Cir.1985) (tester had standing to maintain action for housing discrimination even though he was motivated solely by a desire to challenge the legality of the alleged discriminatory practices); *compare BMC Marketing,* 28 F.3d at 1271 (attempting to

and demonstrable" injury, which could cause a drain on organization resources and thereby give rise to an organization's direct standing to sue. Because testing helps to identify discrimination, the injuries attributable to the discrimination identified by the testing give an organization standing. In allowing the case to proceed, the Supreme Court in no way held or even suggested that the organization's right to judicial relief would be tied to a successful recovery on the part of one or all of the individual, bona fide purchaser plaintiffs. Rather, the Court simply stated in a footnote: "Of course, HOME will have to demonstrate at trial that it has indeed suffered impairment in its role of facilitating open housing before it will be entitled to judicial relief." 455 U.S. at 379 n. 21, 102 S.Ct. 1114.

Nothing in *Havens* suggests that a fair housing organization lacks standing to recover for damages proximately caused by unlawful conduct toward its testers. When a fair housing organization expends resources as a proximate result of the defendant's discriminatory conduct, and those resources would have been devoted to other activities consonant with its mission were it not for the offending conduct, it suffers injury independent of that suffered by individuals in the affected housing market. That is so regardless of whether the offending conduct is directed toward its testers as opposed to bona fide homeseekers such as the individual plaintiffs here.

Moreover, we do not agree with the defendants that allowing the Center to seek damages, on this record, based on discrimination toward its testers is the equivalent of permitting the Center to "create its own injury." There is an obvious difference between the situation highlighted by defendants—where an organization manufacturers the injury necessary to maintain a suit by expending resources on that very suit—and the situation where an organization incurs diversion of resources and frustration of purpose damages as a result of specific documented incidents of unlawful discrimination toward its testers. In the latter situation, the organization is clearly not seeking or inflicting its own injury; the injury is inflicted by the defendants. As a matter of law, the Center is entitled to recover for its own injuries fairly traceable to the defendants' illegal conduct.

In short, even if none of the individual plaintiffs prevail on their claims, the Center is still entitled to seek damages proximately caused by defendants' unlawful discrimination toward the testers. We recognize that, in the event none of the individual plaintiffs succeed in establishing their discrimination claims, the Center's permissible recovery may be quite limited, because it may then seek only those damages that truly

distinguish *Watts* ).

flow from the defendants' unlawful conduct toward its testers. But as the Center asserts, on this record the existence and extent of any independent injury should have been left to the jury to decide.

Accordingly, the trial court erred by instructing the jury that it could only find for the Center if it first found for one of the individual plaintiffs. It is reversible error for a district court to instruct the jury incorrectly regarding the applicable law. *See, e.g., Gulf Life Ins. Co. v. Folsom,* 907 F.2d 1115, 1121 (11th Cir.1990) (in order to withstand the court's scrutiny, an incorrect jury instruction must have "no tendency to confuse or mislead the jury with respect to the applicable principles of law"); *see also Busby v. City of Orlando,* 931 F.2d 764, 777 (11th Cir.1991) ("if there is uncertainty as to whether the jury was actually misled, the [district court's] erroneous instruction cannot be ruled harmless"). In this case, not only was the challenged instruction misleading, the court's special interrogatory compounded the problem by reinforcing the erroneous jury instruction. The combination of the erroneous jury instructions and the erroneous special interrogatories requires a new trial on this record. The jury verdict is vacated as to both the Central Alabama Fair Housing Center and the individual plaintiffs, and we remand for a new trial consistent with this opinion.

VACATED AND REMANDED.