[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-11254

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

TAVARA JAPREE GISSENDANNER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:19-cr-00461-LSC-JHE-1

_____

Before ROSENBAUM, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Tavara Gissendanner appeals his conviction and 480-month sentence for conspiracy to possess with intent to distribute a mixture containing methamphetamine and heroin. He argues that the district court erred in finding that he did not make a prima facie case that the government discriminatorily struck black jurors in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). He also argues that his sentence was procedurally unreasonable because the district court failed to adequately explain the sentence and failed to consider his mitigation arguments. After review, we affirm.

## I.    Background

Gissendanner, along with several other individuals, was charged in a superseding indictment with one count of conspiring to possess with intent to distribute a mixture and substance containing 500 grams or more of methamphetamine and a mixture and substance containing one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. Importantly, Gissendanner was incarcerated on other convictions at the time of the conspiracy and arranged outside drug transactions and shipments from inside the prison. Gissendanner pleaded not guilty, and his case was set for a joint trial with codefendant Isiah Thomas.

(a) *Voir Dire*

Jury selection took place in August 2020.  At the start of the proceeding, Gissendanner moved the district court to treat any objection made by either defendant as "made by both defendants with equal applicability."  The court agreed but explained that objections that were specific to one particular defendant would not be attributed to the other defendant.

Before the venire was brought into the courtroom, the district court noted the racial composition of the jury pool: 30% of the potential jurors were black, 66% were white, 2% were Asian, and 2% were unknown.  Of this pool of potential jurors, a smaller subset was randomly selected (by computer) as the venire to participate in *voir dire*.  Nine black jurors were in the subset of jurors selected for the venire.

The district court requested that each juror provide personal background information.  As relevant to the issues on appeal, Juror 28, a black woman, stated that she was a probation officer for the Jefferson County Family Court.  She explained that she also volunteered for the Alabama Justice Initiative, an organization that advocates for prison reform.  She added that she had a law degree and a master's degree in criminal justice.  She confirmed that she knew several members of the defense team "because of [her] profession."  She also confirmed that her mother was a recovering drug addict.  The defense asked the venire if anyone was familiar with Bullock Correctional Facility in Alabama, and she explained that she knew of the facility because of her prison reform work.

She stated that she had never been to the facility but that she had received "numerous videos" about violent incidents taking place inside the prison.

The district court explained to the venire that it anticipated that there might be law enforcement witnesses who would testify in the case, and it asked the venire if there was anyone who "because of things you have heard, [or] experiences you have had . . . [would] either believe automatically or disbelieve [automatically]" a law enforcement witness's testimony. The court clarified that it needed to know whether just because a witness was in law enforcement, "you are either going to believe automatically or automatically disbelieve [the witness] without applying the credibility standard." In response, Juror 10 stated that "as a black man living in the United States at this time," he did not know if he could give law enforcement "the benefit of the doubt."

Later, the prosecutor, inquired of the venire whether "after watching recent events that have occurred on television, has anyone's opinion been changed, whether positively or negatively, as it relates to law enforcement? Has anyone had their opinion changed over the past six months to a year as it relates to law enforcement?" And Juror 10 responded that his "opinion was bad and it just got worse[]."

During individual voir dire, the district court asked Juror 10 about his prior statement that he automatically would not believe a law enforcement officer's testimony, and Juror 10 confirmed he would "not based on word alone," and that he would need to "have

body cam or something more than just word alone." The district court explained that he would "have to apply the same standards of credibility to [a law enforcement] witness as [he] would any other witness" and the court needed to know if Juror 10 could do that. Juror 10 responded "I don't know. I don't know, your Honor." The following colloquy then occurred:

> [Defense counsel]: [Juror 10], correct me if I am misquoting you, but I believe you said during the open session that you couldn't give law enforcement the benefit of the doubt. Is that how you put it?
>
> [Juror 10]: Yes.
>
> [Defense counsel]: Okay. So, . . . if you are told you're not supposed to give anybody the benefit of the doubt and you are supposed to judge everyone fairly, as the judge has explained, do you feel you could do that, or is it just simply a matter of you can't give them the [benefit of] the doubt but you will hear them out just like everybody else?
>
> [Juror 10]: Basically[,] what I'm saying, I can't give them the benefit of the doubt just because they wear the uniform. Not—
>
> [Defense counsel]: Are you saying you're not going to give them extra credit because they're law enforcement?
>
> [Juror 10]: Correct.
>
> [Defense counsel]: But you will give them the same credit as any other witness?

6                    Opinion of the Court                    21-11254

[Juror 10]:  I would do my best, yes.

[Defense counsel]:  Okay.

The Court:  I have to have it clearer than that. Okay? . . . I need to either know you're going to apply the same standard of credibility or you're not.

[Juror 10]:  I will apply the same standard, your Honor.  Yes.

The Court:  Being fair?

[Juror 10]:  Yes.

Next, during individual voir dire, defense counsel questioned Juror 28 about what she knew about the Bullock Correctional Facility given her prior statement that she knew of incidents at the facility from her prison reform work.  She explained she was aware that there was a lot of violence at the facility, both inmate-on-inmate and officer-on-inmate, but she confirmed that she would be able to set her knowledge aside and be "neutral and unattached to parties."  She also confirmed that knowing members of the defense team from her work as a probation officer would not interfere with her ability to "be neutral and detached."

Following the individual voir dire, the government moved to strike only one of the venire for cause—Juror 10.  The defense objected, arguing that, by the end of the colloquy, Juror 10 had indicated that he would judge and treat all witnesses the same and would be fair and neutral.  The district court noted that it was "a close call," but based on Juror 10's answers to the court's questions, it would not strike him for cause.

The district court then proceeded to address the parties' peremptory strikes. The court explained that the defendants had a total of 10 strikes combined, and the government had six. The defense and the government also each had one peremptory alternate strike. The defendants struck two of the nine prospective black jurors. The government moved to strike four of the prospective black jurors, including Juror 10 and 28.

Gissendanner raised a *Batson* challenge to the striking of Juror 10, arguing that there was no valid basis for his exclusion because by the end of voir dire, he stated that he could be impartial. The following colloquy occurred:

> The Court:   You have not made a prima facie showing of *Batson* because, obviously, he said that he dislikes police, that he doesn't give them the benefit of the doubt. At first he said I wouldn't believe them because they were law enforcement, and then he changed. And I basically allowed him to stay. But then I knew the government would strike him. I didn't give them a challenge for cause. I almost did.
>
> [Defense counsel]:   Understood, your Honor. And the prima facie case I would make is that what the court referenced at the end, his ending statements, as we discussed earlier. But I understand the court's ruling.
>
> [The Court]:   Even his ending statements, [counsel], were not sufficient. Because his ending statements, what he said at the end was derogatory toward law

enforcement. He said, I haven't changed my opinion in the last, however many months, six months or whatever one of y'all asked about.

And, I mean, it was like pulling teeth for y'all to rehabilitate him. I think [you were] able to finally rehabilitate him sufficiently to keep him from being struck for cause.

But he absolutely, there was race neutral reasons, several of them to strike him.

The district court explained that, unless the defense demonstrated a prima facie case under *Batson*, it did not need to ask the government to provide a race neutral reason for its strike.

Gissendanner's codefendant raised a *Batson* challenge to the striking of Juror 28, arguing that because the government had used four of its six peremptory strikes against black jurors, there was a "disparity" on the jury with regard to the proportion of black jurors to other races.[1] Counsel requested that given the disparities, "the venire and the remaining panel be tossed and we start over so we can get a jury that is more representative of the community." Without asking the government for an explanation, the district

---

[1] Defense counsel asserted in the district court that as a result of the government's strikes, there was only 1 black juror left, but the record confirms that statement is incorrect. There were nine black jurors in the venire, the defense struck two and the government struck four, which left three black jurors in the venire that were ultimately seated on the jury. Indeed, Gissendanner agrees in the initial appellate brief that two black jurors were seated on the jury and one served as an alternate.

court denied the challenge, noting that Juror 28 did volunteer prison reform work and had indicated she was aware of "awful stuff" happening at the prison facility.[2]  There were three black jurors seated on the final jury, one of which served as an alternate.

At trial, the jury found Gissendanner and his codefendant guilty as charged.  The evidence showed that, while Gissendanner was an inmate at Bullock Correctional Facility in Alabama, he organized and facilitated drug transactions outside the prison.

### (b) Sentencing Hearing

Before the sentencing hearing, Gissendanner filed a sentencing memorandum setting forth various mitigating circumstances, including that (A) he was 37 years old and faced a statutory minimum sentence of 300 months' imprisonment, which meant that he would be in his 60s upon release and much less likely to reoffend; and (B) he suffered from several mental health issues, and he had a childhood characterized by abuse and neglect.

At sentencing, the district court concluded that Gissendanner qualified as a career-offender based on his criminal history and that the resulting guidelines range was 360 months to life imprisonment.  Gissendanner requested a sentence of 360 months' imprisonment and reiterated his mitigation arguments

---

[2] Additionally, a *Batson* challenge was raised to the striking of Juror 5.  And although Gissendanner discusses the striking of Juror 5 in his brief, he affirmatively states that he is not appealing the denial of the *Batson* challenge as to that juror.

from the sentencing memorandum. The government asked the court to consider "a mid to high end sentence up to and including life," which it argued was appropriate to protect the community from Gissendanner's future crimes, to reflect the seriousness of the offense, and in light of Gissendanner's lengthy criminal history[3] and personal characteristics.

Gissendanner then made a statement explaining that "a lot of that stuff [the government] said is on paper but it's false." He averred that he had changed, and he "continue[s] to try to change to be better." He also maintained his innocence in the present case.

The district court sentenced Gissendanner to 480 months' imprisonment followed by 20 years of supervised release. Addressing Gissendanner, the district court explained that:

> this is not a low end of the guideline range sentence case. It's just not. You were running this operation; you were the leader of it. The fact that you sit there and say with a straight face that you are not guilty and all this stuff is false about you just demonstrates that you have no remorse for what you have done and, left to your own devices, you would continue to do it.

---

[3] The government noted that even without the career-offender enhancement, Gissendanner would have the highest criminal history category of VI due to his lengthy criminal history. Gissendanner's presentence investigation report documented 10 convictions dating back to 1999.

The district court noted that the sentence imposed "strikes a good balance when I consider the nature and circumstances of the offense that you are convicted of as well as your characteristics and the need to protect the public from your crimes as well." Gissendanner objected to the sentence "for the reasons stated earlier." This appeal followed.

## II.    Discussion

### A. *Batson* Claim

Gissendanner argues that the district court misapplied *Batson* and imposed an erroneously high standard for establishing a *prima facie Batson* claim with regard to the striking of Jurors 10 and 28. He maintains that a *prima facie Batson* claim was established due to the government's pattern of striking almost half the black jurors in the venire after it asked voir dire questions—and elicited answers to those questions—that were "tinged by race." He argues that the district court failed to follow the proper three-step inquiry for *Batson* challenges with regard to the striking of Jurors 10 and 28 and erroneously proffered its own race-neutral reasons for the strike without asking the government for its actual reasons. Accordingly, he asserts that the case must be remanded for further *Batson* proceedings and, if necessary, a new trial.

"The Supreme Court in *Batson* established the now-familiar three-part inquiry for evaluating whether a peremptory strike was motivated by racial or ethnic discrimination." *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1038 (11th Cir. 2005) (citing *Batson*,

476 U.S. at 79).  First, "the district court must determine whether the party challenging the peremptory strikes has established a prima facie case of discrimination by establishing facts sufficient to support an inference of racial discrimination."  *Id.* (quotations omitted).  If the challenger has established a prima facie case, "the burden then shifts at step two to the striker to articulate a race-neutral explanation for the challenged strike."  *Id.*  Finally, at step three, the district court must determine whether the striker's "stated reasons were the actual reasons or instead were a pretext for discrimination."  *Flowers v. Mississippi*, __ U.S. __, 139 S. Ct. 2228, 2241 (2019).  Importantly, "the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike." *Ochoa-Vasquez*, 428 F.3d at 1038 (quotations omitted).

"We review the district court's resolution of a *Batson* challenge under the clearly erroneous standard."[4] *Cent. Ala. Fair Hous. Ctr. v. Lowder Realty*, 236 F.3d 629, 635 (11th Cir. 2000). "As part of that review, we give great deference to the district court's finding as to the existence of a prima facie case."  *Id.* (internal quotation marks omitted); *see also Ochoa-Vasquez*, 428

---

[4] The government asserts that the *Batson* challenge to the striking of Juror 28 was raised specifically on behalf of codefendant Thomas only, and we should review Gissendanner's *Batson* challenge as to Juror 28 for plain error only. We disagree. As noted previously, at the beginning of the proceedings, the defense requested that objections made by either defendant be treated as an objection by both, and the district court agreed. Accordingly, Gissendanner's *Batson* challenge to Juror 28 was preserved.

F.3d at 1039 (explaining that a district court's findings as to whether a prima facie case of discrimination has been established are entitled to "great deference" and "[d]e novo review is inappropriate." (quotations omitted)).

"[T]he establishment of a prima facie case is an absolute precondition to further inquiry into the motivation behind the challenged strike." *Ochoa-Vasquez*, 428 F.3d at 1038 (quotations omitted); *United States v. Stewart*, 65 F.3d 918, 925 (11th Cir. 1995) ("No party challenging the . . . use of a peremptory strike—whether that party be the government, a criminal defendant, or a civil litigant—is entitled to an explanation for that strike, much less to have it disallowed, unless and until a prima facie showing of racial discrimination is made."). "Accordingly, the threshold task in considering a *Batson* challenge, for a district court as well as this Court, is to determine whether a *prima facie* case was established. If the answer is no, then the inquiry ceases, and the challenge should be denied." *Lowder Realty*, 236 F.3d at 636.

In establishing a prima facie case, "the defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal." *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990) (quotation omitted). Rather, the defendant must point to circumstances that raise an inference that the government has exercised peremptory strikes to remove from the venire members of a particular racial group. *Id.* Relevant evidence that a defendant may present to support a prima facie case of racial discrimination

14                    Opinion of the Court                    21-11254

include, among other things, (1) the government's pattern of striking venire members of one race or (2) questions or statements made during voir dire to members of a particular race that support the inference of a discriminatory purpose. *Flowers*, ___ U.S. at ___, 139 S. Ct. at 2243; *Batson*, 476 U.S. at 97; *United States v. Robertson*, 736 F.3d 1317, 1326 (11th Cir. 2013).

On appeal, Gissendanner argues that both a pattern of strikes and the government's use of discriminatory questions or statements during voir dire establish a prima facie case. At trial, however, Gissendanner's challenge rested solely on allegations that the government had engaged in a pattern of discriminatory strikes because it used four of its six strikes against the nine black members of the venire which created a racial "disparity" in the jury, and that there was no obvious reason to remove those jurors. Gissendanner never argued to the district court that questions posed by the government during voir dire suggested a discriminatory purpose.[5]    Accordingly, in determining whether

---

[5] Gissendanner argues for the first time in his reply brief that he was not afforded an opportunity to argue in the district court proceedings that the prosecutor's alleged race-tinged questioning was a basis for the *Batson* challenges. We disagree. Gissendanner's trial took place in August 2020 and Gissendanner acknowledges that during that time there was significant "media coverage about police officers' use of force against Black Americans." Reply Br. at 15. Gissendanner did not object to the alleged "race-tinged" questioning during voir dire as to whether certain unspecified recent events had impacted the venirepersons' view of law enforcement. Gissendanner states that he did not object because "the questioning was not objectionable" and explored "a valid subject of inquiry during voir dire." Nevertheless, he

21-11254                Opinion of the Court                15

Gissendanner established a prima facie case, we will consider only the grounds that he advanced below. *See United States v. Houston*, 456 F.3d 1328, 1338 (11th Cir. 2006) (declining to address an additional argument in support of *Batson* challenge raised for the first time on appeal).

As a matter of law, the fact that the government used four of its six peremptory strikes against black members of the venire standing alone is inadequate to establish a prima facie case. *Lowder Realty*, 236 F.3d at 636 ("To begin with, the mere fact of striking a juror or a set of jurors of a particular race does not necessarily create an inference of racial discrimination."); *see also Stewart*, 65 F.3d at 925 (explaining that "no particular number of strikes" used against a particular race or ethnic group "automatically indicates the existence of a prima facie case"). Rather, "[t]he number of persons of a particular race struck takes on meaning *only* when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck." *Lowder Realty*, 236 F.3d at 636–37.

argues that permissible questions may help establish a prima facie case if the questioning was designed to "arm[] a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race." (quotations omitted). However, even if that is true, Gissendanner and his codefendant raised three separate *Batson* challenges, which were discussed at length in the district court, and not once did either Gissendanner or his codefendant mention the prosecutor's alleged improper questioning during voir dire as a basis for its prima facie case, despite having ample opportunity to do so.

The district court concluded that Gissendanner failed to establish a prima facie case.  As the district court correctly observed, our precedent requires more than pointing to the bare fact of the removal of venirepersons of a certain race.  *Id.* at 637 ("In making out a prima facie case, the defendant must point to more than the bare fact of the removal of certain venire persons and the absence of an obvious valid reason for the removal." (quotations omitted)).  In rejecting Gissendanner's challenge, the district court considered the totality of the circumstances, including the racial composition of the jury, the answers of the struck jurors during voir dire which demonstrated an "obvious valid reason" for removal, and that the defense failed to point to any other facts or circumstances—other than bare numbers and no valid reason for removal—to support an inference of improper racial discrimination.  Additionally, three black jurors, including one alternate, were seated on Gissendanner's jury, which further undermines his prima facie case.  *Id.* at 638 (holding that "the unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a *prima facie* case of discrimination in the peremptory striking of jurors of that race"); *see also United States v. Hill*, 643 F.3d 807, 838–39 (11th Cir. 2011) (holding that there was a strong basis for finding no prima facia case existed where the government used 64% of its strikes against black jurors, but several unchallenged black jurors served on the 18-person jury).

Accordingly, for the reasons stated above, Gissendanner has not shown that the district court's prima facie determination was clearly erroneous, and our inquiry must end.  See Hill, 643 F.3d at 837–38 ("[T]he trial court's [prima facie] determination is entitled to great deference, and must be sustained unless it is clearly erroneous." (quotations omitted)); Ochoa-Vasquez, 428 F.3d at 1039 ("We give great deference to a district court's findings of whether a prima facie case of impermissible discrimination has been established" and "it will not be disturbed on appeal unless it is clearly erroneous or appears to have been guided by improper principles of law." (quotations omitted)); Lowder Realty, 236 F.3d at 636 ("[T]he threshold task in considering a Batson challenge, for a district court as well as this Court, is to determine whether a prima facie case was established.  If the answer is no, then the inquiry ceases, and the challenge should be denied.").

## B.  Sentencing Claim

Gissendanner argues that his sentence is procedurally unreasonable because the district court inadequately explained the chosen sentence and failed to consider his mitigation evidence.

We review a sentence for both procedural and substantive reasonableness under a deferential abuse of discretion standard.  See Gall v. United States, 552 U.S. 38, 51 (2007).  In reviewing a sentence for procedural reasonableness, we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the

§ 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *United States v. Pugh*, 515 F.3d 1179, 1190 (11th Cir. 2008) (quotations omitted).

The district court must issue a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of 18 U.S.C. § 3553(a)(2), which include the need for a sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, and protect the public from future criminal conduct. 18 U.S.C. § 3553(a). The court must also consider the "nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* § 3553(a)(1). "[T]he district court need only 'acknowledge' that it considered the § 3553(a) factors, and need *not* discuss each of these factors . . . ." *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007) (quotation and internal citation omitted). Importantly, the weight given to a particular § 3353(a) factor "is committed to the sound discretion of the district court," and the district court is not required to give "equal weight" to the § 3553(a) factors. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (quotation omitted). When explaining a sentence, the district court judge must "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007).

Here, the district court adequately explained the reasons for Gissendanner's sentence, including that Gissendanner was a leader and organizer of the drug operation, continued to maintain his innocence, and had a lengthy criminal record. The district court emphasized that the sentence imposed struck "a good balance" between the nature and circumstances of the offense and Gissendanner's personal history and characteristics, and the need to protect the public. The district court's statements establish that it considered the § 3553(a) factors and had a reasoned basis for its sentencing decision. The fact that the district court did not address Gissendanner's mitigation arguments does not mean that the district court failed to consider them. *See Amedeo*, 487 F.3d at 833. Furthermore, we know that the district court considered Gissendanner's mitigation arguments because it heard his counsel's mitigation arguments at sentencing.[6] Accordingly, on this record, we conclude there was no procedural error.

---

[6] The Supreme Court's recent decision in *Concepcion v. United States*, 142 S. Ct. 2389 (2022), which Gissendanner relies on as supplemental authority, does not change our analysis. *Concepcion* involved the question of whether a district court must consider intervening changes in the law when deciding a motion for modification of sentence under the First Step Act. *Id.* at 2396. It has no direct application to Gissendanner's case. Furthermore, *Concepcion* did not alter the general principle that the district court need not explicitly address every § 3553(a) factor or mitigation argument as long as the record reflects that the district court considered the arguments before it. *Id.* at 2404 ("Of course, a district court is not required to be persuaded by every argument parties make, and it may, in its discretion, dismiss arguments that it does not

### III.    Conclusion

For the above reasons, we affirm Gissendanner's conviction and sentence.

**AFFIRMED.**

---

find compelling without a detailed explanation. Nor is a district court required to articulate anything more than a brief statement of reasons.").