[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 2, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-11224

_____

D. C. Docket No. 04-20486-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BOBBIE LANE KENDLE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 2, 2006)**

Before DUBINA and KRAVITCH, Circuit Judges, and MILLS,* District Judge.

KRAVITCH, Circuit Judge:

---

*Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

Bobbie Lane Kendle appeals his conviction and the sentence imposed after a jury found him guilty of one count of possession with intent to distribute crack cocaine. Specifically, he raises a *Batson* claim, questions the sufficiency of the evidence, and challenges his sentence. After oral argument and a thorough review of the record, we affirm.

## I.

A federal grand jury indicted Kendle and his co-defendant, Tinhangie Hunt,[1] for (1) knowingly and intentionally possessing with intent to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 (Count 1); (2) knowingly and intentionally possessing with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (Count 2); and (3) knowingly and intentionally possessing with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 18 U.S.C. § 2 (Count 3). Kendle pleaded not guilty to all three counts and a jury trial followed. Prior to trial, the government filed a notice of sentence enhancement under 21 U.S.C. § 851, stating that Kendle had two prior felony drug convictions.

### A. Jury Selection

During jury selection, potential jurors Frederica McDuffie, an African-

---

[1]Tinhangie Hunt was indicted on two additional counts in the indictment and pleaded guilty prior to trial.

American woman, Steve Padilla, and Gail Lenoble stated in response to questions from the court regarding scheduling that they may have problems with childcare depending on when the court recessed for the day. Specifically, McDuffie stated that she had to pick up her grandson at 5:45 p.m., and she did not think there would be enough time to pick him up. When the court asked if she would have enough time if court recessed by 5:00 p.m., McDuffie replied that, because she had to use public transportation, it would be "pushing it." Padilla, whose race was not apparent from the record, stated that he had "to pick up [his] children from school by 5:00." Lenoble, a white woman, stated that she needed to pick up her children by 6:00 p.m. and agreed with McDuffie that it would be "pushing it" to get there if the court recessed by 5:00 p.m., but she then added: "But I guess, you know, for a couple of days we would have to do it." Additionally, a juror who did not give his name, but is identified later in the record as Vaxton Payne, an African-American, advised the court that he had a misdemeanor marijuana conviction.

The government moved to excuse McDuffie for cause based on the childcare issues she raised during voir dire. Kendle did not object, and the court excused her. The government also used peremptory challenges to remove Donovin Kemp and Payne, both African-Americans, from the jury panel. Of its four remaining peremptory strikes, the government struck Josh Young, Mayra Marimon, and

Carlos Irias, whose ethnicities were not apparent from the record.

After the government struck Kemp, Kendle objected on *Batson*[2] grounds, requesting that the government provide a race-neutral reason for the strike and arguing that "there is no reason for the government to want to strike this person other than the fact that [he] is a black man." The court overruled the objection, explaining that Kendle had not met his prima facie burden and also noting that an African-American juror already had been seated.

When the district court came to Padilla, the government noted that he had childcare issues and said "I don't know if your honor wants to excuse him for cause, but otherwise he is fine with us." Kendle did not object, and the court dismissed Padilla for cause. Later, when the district court arrived at Lenoble, the government pointed out that she had raised childcare issues. The court noted that Lenoble said she would be fine if court recessed by 5:00 p.m., and the government did not move to dismiss her for cause. Kendle then moved to dismiss her for cause, arguing that the court already excused McDuffie, an African-American, for the same reason. The court asked Lenoble if she would have enough time with a 5:00 p.m. recess, she answered affirmatively, and the court denied Kendle's motion.

---

[2]*Batson v. Kentucky*, 476 U.S. 79 (1986).

Finally, Kendle objected after the government struck Payne, who would have been seated as an alternate, requesting that the government provide a race-neutral reason for striking him. The court overruled the objection. Ultimately, two African-American jurors were seated.

B. Trial Testimony

At trial, the government called Detective Thomas Mead of the Homestead Police Department, the lead investigator in Kendle's arrest. Mead testified that on March 24, 2004, he watched an individual later identified as James Butts take currency from an unknown individual, walk to the house at 867 Southwest 6th Street in which Kendle was living, and conduct a hand-to-hand transaction with Kendle in which Butts was given an unknown object. After Butts left Kendle's home, Mead and another officer pursued and detained Butts, who was found to have cocaine and marijuana on his person. Mead and his partner then went to Kendle's house, and as they approached, Kendle ran into the house from the front yard and locked the door behind him. Mead said that he attempted to speak with Kendle through the door, but Kendle did not respond.

Mead then testified that the police department began to surveil the house, and numerous individuals were seen there buying drugs, for which those individuals were subsequently arrested. Mead stated that he had a confidential

5

informant ("CI") conduct a controlled buy at Kendle's house on May 10. Mead watched Kendle go into the house earlier that day, prior to the CI's arrival. A woman at the house, later identified as Tinhangie Hunt, sold crack cocaine to the CI. A second controlled buy was conducted the next day, May 11, in the same manner as the May 10 buy.

Mead next testified that a search warrant was obtained from a state court judge, which was executed on May 17. Kendle, Hunt, and another woman were found in the house. After reading Kendle his rights, which Kendle indicated that he understood, Mead asked Kendle if he would tell him the location of the drugs or if they needed to search for them. Kendle responded verbally that they did not need to search and he motioned with his chin to several locations in the room, including (1) a shelf with a bag of marijuana, a false-bottomed container with two pieces of crack cocaine, and a brown paper bag with cocaine; (2) a shoe box containing packages of marijuana; and (3) a cigar box containing marijuana. The officers also found approximately $1,100 under a carpet and on a shelf. Mead then arrested Kendle and Hunt, and as they left the house, Mead locked the door to the house with keys that Kendle gave him. Mead also testified that a vehicle was seized as a result of the search and that the vehicle title corresponding to the seized vehicle contained Kendle's signature and listed his address as that of the house in

6

question. He further stated that prescription bottles taken from the house bore Kendle's name.

Next, Mead testified that on July 22, 2004, he went with federal officers to the residence to re-arrest Kendle and Hunt. As they arrived, Mead looked through a window and saw a plate resting on the arm of a sofa holding what Mead suspected was crack cocaine. Kendle refused to open the door for the officers, and while they waited to gain entrance, Mead watched Kendle carry the plate into another part of the house. Mead stated that Kendle and Hunt were arrested, and the plate was recovered and tested positive for drug residue.

On cross-examination, Mead said that Hunt was seen at the house every day, her documents were found there, and some unknown person paid the rent. Mead acknowledged that the house was not rented to Kendle and that on April 6, police surveilled the house and witnessed three suspected drug sales. Mead admitted that Kendle was not seen making any transactions that day and that Hunt made both the May 10 and May 11 sales.

The government also called Detective Robert Salinas of the Homestead Police Department, who testified that he was involved in the investigation on the day of Kendle's first arrest. Salinas testified that the police entered a house that Kendle was known to reside at and described the locations within the house where

7

the police found the drugs, drug containers, and paraphernalia. Salinas stated that a phone bill obtained from the house was addressed to Kendle at 867 Southwest 6th Street, which was the street address of the residence where Kendle was arrested and the drugs were found. Salinas testified that a scale and plastic bag sealer were also found at the house.

Finally, the government called Ethan Jolly, a forensic chemist with the Drug Enforcement Administration, who testified regarding the drug weights and types that the government introduced into evidence. On cross-examination, when asked how confident he was that the drugs in question belonged to Kendle, Jolly replied that he was only responsible for analyzing the evidence and that he was not aware of with whom the exhibit was associated.

Kendle rested without calling witnesses and moved for judgment of acquittal at the close of the evidence on the basis that the government had failed to present a prima facie case, which the district court denied. Kendle also renewed his *Batson* objection, arguing that a prima facie case was shown "by pointing out that those jurors were members of cognizable classes." The district court again found that Kendle could not establish a prima facie case and gave a lengthy explanation of its reasoning. First, Kendle did not proffer any evidence that could be used to infer that the government's strikes were racially motivated except for the potential

8

jurors' race. Second, the court noted that there was sufficient difference between the two women with childcare issues to warrant excusing McDuffie for cause while not excusing Lenoble because Lenoble was not relying on public transportation and had more time to reach her destination. Third, Payne admitted to having a misdemeanor marijuana conviction, which supported the government's decision to strike him. Fourth, the prosecution did not do or say anything during voir dire that would allow an inference of discriminatory intent because the court conducted voir dire. Fifth, the district court noted that African-American jurors were seated roughly in proportion to their number in the venire: African-Americans made up approximately 14% of the venire – out of 34 potential jurors, 5 were African-American – and the 2 African-Americans who were seated accounted for approximately 16% of the 12-person jury. Finally, the prosecution did not use all of its peremptory challenges. After the jury was charged, Kendle renewed the motion for acquittal and the *Batson* objection, both of which the district court overruled.

During jury deliberations, the jury informed the judge that they were having problems coming to a consensus on Counts 1 and 3. The government attorney proposed a settlement to Kendle, under which he would plead guilty to Count 3 and serve ten years, but stated that the plea agreement would have to be approved

by someone in his office.  The jury continued to deliberate and returned a verdict before the government approved the plea agreement.  The jury found Kendle guilty of Count 1 for possession with intent to distribute 5 grams or more of crack cocaine, as opposed to 50 grams or more, and it found him not guilty of Counts 2 and 3.

C.  Sentencing

The probation officer prepared a presentence investigation report ("PSI"), which assigned Kendle a base offense level of 32, under U.S.S.G. § 2D1.1(c)(4) for 293.43 grams of marijuana, 2.5 grams of powder cocaine, and 78.37 grams of crack.  The probation officer applied a § 4B1.1 career-offender enhancement because Kendle was 18 years old when he committed at least two prior crimes of violence or drug-related crimes, which raised the total offense level to 37 because the instant offense's statutory maximum was life.  The probation officer found that Kendle had criminal history points that warranted a criminal history category of V, but also noted that as a career offender, his category should be VI, pursuant to § 4B1.1.  The probation officer further noted that the minimum statutory term of imprisonment was ten years, and the maximum was life, pursuant to 21 U.S.C. §§ 841(b)(1)(B), 851.  Based on the total offense level of 37 and criminal history category of VI, the probation officer calculated the guideline range to be 360

months to life.

Kendle objected to the § 4B1.1 career offender enhancement and 21 U.S.C. § 851 enhancement, arguing that *Blakely*[3] and *Apprendi*[4] allowed the use of prior convictions but precluded the use of these enhancements because they were not charged in the indictment, and a jury did not find beyond a reasonable doubt that (1) Kendle was 18 years old when the offenses were committed, (2) the instant crime was a crime involving violence or a controlled substance, and (3) Kendle had two previous convictions for such crimes. Kendle also noted that the U.S. Supreme Court recently stated that *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), was problematic in nature, even though this court continues to apply it.

The district court explained that *Booker*[5] held that the guidelines range should be considered even if it was only advisory and stated that "with or without the guidelines," the guidelines range of 360 months to life seemed appropriate in his case. The court noted that the guidelines range correctly identified Kendle as a career offender. The court then continued sentencing to allow the parties to brief the issue of whether application of *Booker* to Kendle constituted an ex post facto or due process violation.

[3]*Blakely v. Washington*, 542 U.S. 296 (2004).

[4]*Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[5]*United States v. Booker*, 543 U.S. 220 (2005).

11

Kendle argued that if a more lenient interpretation of the guidelines is in effect at the time a crime is committed, the defendant is entitled to that application in order to prevent ex post facto violations. Kendle contended that *Blakely* was the interpretation in effect when he committed his crime, and because *Blakely* holds that the maximum sentence a judge may impose must be based on facts found by the jury or admitted by the defendant, it is more lenient than the *Booker* version. Kendle asserted that this would give him an offense level of 26 for the 5 grams or more of crack that the jury found he possessed, and a criminal history category of V, based solely on his criminal history, which would result in a guidelines range of 110 to 137 months. Kendle maintained that if the court treated the guidelines as advisory and then enhanced his sentence with judicially found facts, his due process rights would be violated through the ex post facto application of *Booker*.

At the continued sentencing hearing, Kendle reiterated his prior arguments and contended that he should be sentenced under the guidelines range that would have resulted from the jury's verdict alone.

The government replied that sentencing with a career-offender or 21 U.S.C. § 851 enhancement without presenting the question to a jury was not precluded by *Booker*, *Blakely*, or *Apprendi*, and even if the only amount of drugs attributed to Kendle by the jury was five grams of crack, the statutory maximum still would be

12

life based on his relevant conduct and prior convictions. The government asserted

that Kendle was on notice at all times as to the statutory maximum that he faced,

regardless of the sentencing scheme in place.

The district court found that there was no need to have a jury determination

on the question of prior convictions or career-offender status and rejected Kendle's

ex post facto argument. The district court sentenced Kendle to 360-months

imprisonment and 8-years supervised release. Kendle then timely filed this appeal.

## II.

A. *Batson* Challenge

First, Kendle contends that the district court erred in rejecting his *Batson*

challenge. This court reviews "the resolution of a *Batson* challenge giv[ing] great

deference to a district court's finding as to the existence of a prima facie case. *De*

*novo* review is inappropriate." *United States v. Ochoa-Vasquez*, 428 F.3d 1015,

1039 (11th Cir. 2005).[6] As the district court's determination of the reason for a

juror's dismissal is a finding of fact, we will not overturn it "unless it is clearly

erroneous or appears to have been guided by improper principles of law." *Id.*

---

[6]Kendle's argument that the Supreme Court's decision in *Johnson v. California*, 545 U.S. 162, 125 S. Ct. 2410 (2005), altered the standard of review is misplaced. In *Johnson*, the Court rejected California's use of a "more likely than not" standard in conducting the prima facie inquiry required by *Batson*. 125 S. Ct. at 2416. The Court did not address the standard of review.

(internal quotation marks omitted).

The Supreme Court has held that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). "*Batson* established the now-familiar three-part inquiry for evaluating whether a peremptory strike was motivated by racial or ethnic discrimination." *Ochoa-Vasquez*, 428 F.3d at 1038. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 125 S. Ct. 2410, 2416 (2005) (quoting *Batson*, 476 U.S. at 93-94). This is not a heavy burden; it requires only that the defendant "produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.* at 2417. "[T]he establishment of a *prima facie* case is an absolute precondition to further inquiry into the motivation behind the challenged strike." *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 636 (11th Cir. 2000). "If the objector makes a prima facie showing, the burden then shifts at step two to the striker to articulate a race-neutral explanation for the challenged strike." *Ochoa-Vasquez*, 428 F.3d at 1038. "Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" *Johnson*, 125 S. Ct. at 2416 (quoting

14

*Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam)). The ultimate burden of persuasion, however, lies with the opponent of the strike. *Ochoa-Vasquez*, 428 F.3d at 1038-39.

As an initial matter, to the extent that Kendle is challenging the for-cause dismissal of McDuffie, Kendle's challenge fails because "no authority suggests *Batson* extends to the area of challenges for cause." *United States v. Blackman*, 66 F.3d 1572, 1575 n.3 (11th Cir. 1995); *see also United States v. Elliott*, 89 F.3d 1360, 1364-65 (8th Cir. 1996); *United States v. Bergodere*, 40 F.3d 512, 515-16 (1st Cir. 1994).

In analyzing Kendle's challenge to the government's peremptory strikes of Kemp and Payne, we are guided by the thorough and thoughtful legal analysis performed by the district court and discussed earlier in this opinion, and we conclude that the district court correctly found that Kendle failed to establish a prima facie case under *Batson*. To begin, at trial, Kendle did not proffer any evidence that could be used to infer that the government's strikes were racially motivated except for the potential jurors' race. "[A] showing that a party used its authorized peremptory strikes against jurors of one race does not, standing alone, establish a *prima facie* case of discrimination." *Lowder Realty*, 236 F.3d at 637.

The two arguments Kendle advances in his brief are similarly unavailing.

15

First, he argues that the government's disparate treatment of McDuffie and Lenoble allows an inference of discriminatory intent. Although the district court did not excuse Lenoble for cause, as it had McDuffie, the government reminded the district court that Lenoble mentioned that she had similar childcare issues. The district court found that there was sufficient difference between the two women because Lenoble did not need to use public transportation and she had more time to reach her destination. Further, the court specifically asked Lenoble whether she would have enough time to pick up her children and she answered affirmatively. Additionally, the government also moved for the court to dismiss Padilla for cause based on his childcare issues, which the district court did. Padilla's race is not apparent from the record, but Kendle did not object to his for-cause dismissal.

Second, Kendle argues that the district court ignored numerical evidence showing that the government challenged the bulk of the available black members of the jury venire. The government, however, only exercised peremptory challenges against two of the five African-American members of the venire; the third challenge (McDuffie) was for cause, and Kendle did not object. Moreover, even if Kendle could show a statistical disparity, which he cannot, statistical information can support an inference of discrimination only when placed in context, which Kendle fails entirely to provide. *See Ochoa-Vasquez*, 428 F.3d at

16

1044. In fact, the context provided by the district court demonstrates that such an inference is not plausible. Two African-Americans were seated on the jury without a government challenge. *Lowder Realty*, 236 F.3d at 638 ("[T]he unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race."). Next, the government did not use all of its allotted peremptory challenges and could have used the remaining one against one of the two African-Americans who were eventually empaneled. *Ochoa-Vasquez*, 428 F.3d at 1045. Finally, the district court did conduct a numerical analysis, which Kendle ignores, and it concluded that the percentage of African-American jurors seated was roughly equivalent to the percentage in the venire.

B. Sufficiency of the Evidence

Second, Kendle argues that the evidence presented at trial was insufficient to support the jury's finding that he was guilty of possession with intent to distribute 5 grams or more of crack cocaine. We review de novo a challenge to the sufficiency of the evidence. *United States v. Gunn*, 369 F.3d 1229, 1234 (11th Cir.), *cert. denied*, 543 U.S. 937 (2004). "In assessing the sufficiency of the evidence, this [c]ourt views the evidence in the light most favorable to the government with all reasonable inferences and credibility choices made in the

17

prosecution's favor." *United States v. Alaboud*, 347 F.3d 1293, 1296 (11th Cir. 2003). "A jury's verdict must be sustained against such a challenge if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotations and citation omitted).

In order to sustain a conviction for possession of a controlled substance with intent to distribute, "the government must prove beyond a reasonable doubt that the defendant knowingly possessed the [controlled substance] and that he intended to distribute it." *United States v. Mejia*, 97 F.3d 1391, 1392 (11th Cir. 1996). These elements can be proven by either direct or circumstantial evidence. *United States v. Poole*, 878 F.2d 1389, 1391-92 (11th Cir. 1989). "Evidence of surrounding circumstances can prove knowledge." *United States v. Alvarez*, 837 F.2d 1024, 1027 (11th Cir. 1988). "Possession may be actual or constructive, and the latter can be established by evidence showing ownership, dominion, or control over the contraband itself or the premises on which it is concealed." *United States v. Montes-Cardenas*, 746 F.2d 771, 778 (11th Cir. 1984). "Constructive possession may be shared with others, and can be established by circumstantial or direct evidence." *Id.*

The evidence, when viewed in the light most favorable to the government, demonstrates that Kendle actually or constructively possessed the crack cocaine. A

18

jury could reasonably infer that Kendle lived in the house at 867 Southwest 6th Street and exercised ownership, dominion, or control over the house in which the drugs were concealed based on (1) the phone bill and car title that both listed his address as that of the house in question; (2) his ownership of keys to the residence; (3) the prescription bottles that bore his name that were found at the residence; and (4) the fact that he was seen at the residence almost every day that police testified to surveilling the house. Additionally, the jury heard testimony that Kendle indicated to the police where to search for the drugs in the house and the police found drugs in those locations, that Kendle was seen making what appeared to be a drug sale on March 24, that he was nearly always at the house when drugs were being sold, and that on the date of Kendle's federal arrest Officer Mead saw Kendle take a plate with what looked like a crack "cookie" into another part of the house and the plate later tested positive for drug residue. Such evidence was certainly enough for the jury to infer that Kendle knowingly possessed the crack cocaine. Finally, Kendle's intent to distribute could be inferred from the testimony that (1) stashes of drugs were found individually packaged in small bags; (2) a large amount of cash was seized from the residence; and (3) a scale and plastic bag sealer were found at the house.

C. Sentencing Issues

Finally, Kendle argues that the retroactive application of the *Booker* remedial holding violated due process as an ex post facto application of an advisory sentencing scheme and that the legality of his sentence and the use of the career-offender enhancement turns on the continued validity of *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). Because Kendle raised both *Blakely* and *Booker* objections in the district court, we review his claims de novo, but reverse only for harmful error. *United States v. Paz*, 405 F.3d 946, 948 (11th Cir. 2005). "We review *de novo* a defendant's claim that his sentence violated *ex post facto* principles." *United States v. Thomas*, 446 F.3d 1348, 1351 (11th Cir. 2006).

First, this court already has rejected Kendle's ex post facto challenge. *Thomas*, 446 F.3d at 1355; *United States v. Martinez*, 434 F.3d 1318, 1324 (11th Cir. 2006); *United States v. Duncan*, 400 F.3d 1297, 1307-08 (11th Cir.), *cert. denied*, — U.S. —, 126 S. Ct. 432 (2005). Kendle had "ample warning" that 360 months imprisonment, or even life imprisonment, was a potential consequence of his actions because (1) life imprisonment was specified in the United States Code as the statutory maximum for the crime, 21 U.S.C. § 841(b)(1)(B)(iii); and (2) the guidelines in effect at the time he committed the crime and at the time he was sentenced informed him that the sentencing judge could engage in factfinding and could impose a possible life sentence. *Thomas*, 446 F.3d at 1355; *Martinez*, 434

20

F.3d at 1324; *Duncan*, 400 F.3d at 1307; *see also Blakely*, 542 U.S. at 305 n.9 ("The Federal Guidelines are not before us, and we express no opinion on them.").

Second, as Kendle concedes, this court repeatedly has held that *Apprendi*, *Blakely*, and *Booker* did not disturb the Supreme Court's holding in *Almendarez-Torres* that the government need not allege in its indictment nor prove beyond a reasonable doubt that a defendant had prior convictions for a district court to use those convictions for purposes of enhancing a sentence. *United States v. Camacho-Ibarquen*, 410 F.3d 1307, 1315-16 (11th Cir. 2005). "Although recent decisions, including *Shepard v. United States*, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), may arguably cast doubt on the future prospects of *Almendarez-Torres*'s holding regarding prior convictions, the Supreme Court has not explicitly overruled *Almendarez-Torres*. As a result, we must follow *Almendarez-Torres*." *Id.* at 1316 n.3. The district court, therefore, did not err in applying the career-offender enhancement.

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

**AFFIRMED.**