[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14640

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 24, 2009
THOMAS K. KAHN
CLERK

D.C. Docket No. 06-00175-CR-BBM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TACCARRA THOMAS,
MESFIN TEFERA,
JARRIOUS K. MOON,
ABDUL L. HOLYFIELD,
MANZILA BEINVENU,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(February 24, 2009)

Before BIRCH and PRYOR, Circuit Judges, and STROM,* District Judge.

STROM, District Judge:

_____

* Honorable Lyle E. Strom, Senior United States District Judge for the District of
Nebraska, sitting by designation.

On October 10, 2006, a grand jury sitting in the Northern District of Georgia charged Thomas, Tefera, Moon, Holyfield, Beinvenu, and others in a thirty-five count superseding indictment with conspiracy to commit bank fraud in violation of 18 U.S.C. § 371 ("Count 1"), multiple counts of bank fraud in violation of 18 U.S.C. §§ 1344 and 2, and multiple counts of aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 2. Each substantive count of bank fraud charged in the indictment pertains to a different bank account.[1]

Thomas, Tefera, Moon, Holyfield, and Beinvenu pleaded not guilty and were tried together in a jury trial that commenced on June 25, 2007. On July 11, 2007, the jury returned guilty verdicts against Thomas on Counts 1, 14, 24, 26, and 30; against Tefera on Counts 1, 2, and 26; against Moon on Counts 1, 2, 3, 8, 9, 10, 11, 16, 17, 28, and 29; against Holyfield on Counts 1, 6, 7, 12, 13, 24, and 26; and against Beinvenu on Counts 1 and 8.

---

[1] The following bank accounts are listed in the indictment: Guilfoyle Networking, Inc. (Counts 2, 3); Oxford Interior Designs (Counts 4, 5); MTLA Electric, Inc. (Counts 6, 7); BLS Plumbing (Counts 8, 9); Regina Lupoli, DBA Metro Homes (Counts 10, 11); Neeley Computer Services (Counts 12, 13); Star Remodeling (Counts 14, 15); KP Construction (Counts 16, 17); A. Brooks Plumbing Co. (Counts 18, 19); Britt Design (Counts 20, 21); Stone Property Management (Counts 22, 23); Rogers & Associates (Counts 24, 25); Kirk & Associates (Counts 26, 27); Katex Property Management (Counts 28, 29), L.C. Financial (Counts 30, 31); DeVore Graphics (Counts 32, 33); Mary Ford (Counts 34, 35). The even numbered counts represent charges of bank fraud; the odd numbered counts represent charges of aggravated identity theft.

Thomas was sentenced to 33 months imprisonment, five years supervised release, and ordered to pay restitution in the amount of $123,258.77 to Bank of America. Tefera was sentenced to 24 months imprisonment, three years supervised release, and ordered to pay restitution of $68,278.56 to Bank of America. Moon was sentenced to 70 months imprisonment, five years supervised release, and ordered to pay restitution in the amount of $201,918.78 to Bank America. Holyfield was sentenced to 65 months imprisonment, three years supervised release, and ordered to pay restitution in the amount of $212,676.40 to Bank of America, and Beinvenu was sentenced to 24 months imprisonment, three years supervised release, and ordered to pay restitution in the amount of $49,294.31 to Bank of America.

## FACTUAL BACKGROUND

The bank fraud scheme that appellants were convicted of being involved with generally involved four steps: (1) individuals filed false incorporation documents to create shell corporations,[2] (2) the false incorporation documents and false identification were used to open business checking accounts at Bank of America, (3) counterfeit checks drawn on existing Bank of America lines of credit

_____

[2] The corporations did not conduct business and existed solely for the purpose of committing bank fraud.

accounts were deposited into the checking accounts, and (4) funds were withdrawn from the accounts by using debit cards issued to the checking accounts to make cash withdrawals from automated teller machines ("ATM") or using debit cards to purchase United States postal money orders at post offices.

At trial, four co-defendants charged in the indictment with appellants, including Charles Brown, Janelle Crosby, Joseph Head, Jr., and Toni Lynne Smith, testified for the government. Head testified that Tefera and an individual named Augustine Amuah introduced Head to the idea of committing bank fraud as a way to make money, and Amuah, Holyfield, and Beinvenu organized the bank fraud scheme. Head further testified that, Amuah, Holyfield, and Beinvenu provided Head, Brown, and Tefera with fake identification, and Beinvenu drove Head to post offices and gave Head debit cards to purchase money orders. On several occasions, Head saw Holyfield at Amuah's residence, where articles of incorporation, tax identification papers, and false identification were in plain view. Brown testified that Tefera drove Brown to the bank to open the Guilfoyle Networking, Inc. account and on a second occasion when Brown deposited a check into an account. Brown testified that Tefera drove Brown to cash money orders and provided Brown with false identification. Smith testified that Thomas instructed Smith on how to open the L.C. Financial account, provided Smith with

4

documents to open the account, and drove Smith to the bank to open the account. According to Smith, Thomas stated that she had opened similar bank accounts before. Tefera and Thomas testified on their own behalf.

Moon was employed at Bank of America. During a Bank of America investigation, Moon was identified as an employee who had accessed some of the bank accounts under investigation. Bank investigators interviewed Moon, and a bank investigator testified that Moon admitted during the interview that he accessed account information. According to the bank investigator, Moon stated that he was approached by individuals who promised to give Moon a Mercedes Benz if Moon provided lines of credit account information to the individuals. A postal inspector testified that Moon made similar statements to her during a subsequent interview, and during that interview, Moon identified a picture of Amuah as being one of the individuals to whom he provided account information. Crosby testified that on one occasion Moon agreed to accept a counterfeit check for deposit from Crosby and Smith. Crosby testified that she and Smith attempted to deposit the check at different bank locations, but the banks rejected the deposit. However, Moon agreed to accept the deposit after he was contacted by Amuah.

## ISSUES

The appellants assert several issues on appeal. We address the following issues: (1) appellants' Batson challenge, (2) the admission of Douglas Ross' testimony, and (3) issues regarding the calculation of Moon's sentence. We have considered the other issues asserted by appellants but find them to be without merit.

## STANDARDS OF REVIEW

When reviewing the district court's resolution of a Batson challenge, we give "great deference to a district court's finding as to the existence of a prima facie case." United States v. Allen-Brown, 243 F.3d 1293, 1296 (11th Cir. 2001)(quoting Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., 236 F.3d 629, 635 (11th Cir. 2000))(internal quotation marks omitted). We will not disturb a district court's finding as to why a juror was excused "unless it is clearly erroneous or appears to have been guided by improper principles of law." Id. at 1297 (quoting United States v. Williams, 936 F.2d 1243, 1246 (11th Cir. 1991)).

We review the district court's evidentiary rulings for abuse of discretion. United States v. Brown, 415 F.3d 1257, 1264-65 (11th Cir. 2005). "An abuse of discretion can occur where the district court applies the wrong law, follows the

wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." Id. at 1266.

With regard to sentencing determinations, we review a district court's finding that a defendant used sophisticated means for clear error. Robertson, 493 F.3d at 1329-30. We also review the district court's determination of whether a defendant qualifies for a minor role adjustment for clear error. United States v. Rodriguez De Varon, 175 F.3d 930, 934 (11th Cir. 1999)(en banc). "A factual finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Robertson, 493 F.3d at 1330 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985))(internal quotation marks omitted).

## DISCUSSION

### 1. Batson Challenge

Holyfield claims the district court clearly erred when it determined the government proffered legitimate race and gender neutral reasons for its exercised peremptory challenges.[3] During jury selection, the government struck five white

---

[3] Thomas and Beinvenu join in Holyfield's Batson appeal.

women, and Holyfield asserted a "reverse Batson[4] objection" on race and gender grounds as to four of the five jurors.[5] The district court overruled the objection as to all four jurors.

The use of peremptory challenges solely on the basis of a potential juror's race or gender violates equal protection principles of the Fifth Amendment. See Batson, 476 U.S. at 89; see United States v. Steele, 178 F.3d 1230, 1235 (11th Cir. 1999); see United States v. Rodriquez, 917 F.2d 1286, 1288 n. 2 (11th Cir. 1990), vacated in part on other grounds by rehearing, 935 F.2d 194 (11th Cir. 1991). "The Batson three-step procedure for evaluating an objection to a peremptory challenge is as follows: (1) the objector must make a prima facie showing that the peremptory challenge is exercised on the basis of race [or gender]; (2) the burden then shifts to the challenger to articulate a race-neutral [and gender-neutral] explanation for striking the jurors in question; and (3) the trial court must determine whether the objector has carried its burden of proving purposeful discrimination." Allen-Brown, 243 F.3d at 1297.

The government claims there was no prima facie showing of racial discrimination. To determine whether a prima facie case has been established,

_____

[4] Batson v. Kentucky, 476 U.S. 79 (1986).

[5] Holyfield conceded at trial that the government had valid reasons for striking the fifth juror.

8

"the trial court should consider all relevant circumstances."  Batson, 476 U.S. at 96.  A "pattern" of strikes against jurors of a particular race or gender in the venire might give rise to an inference of discrimination.  See id. at 96-97.  We assume for purposes of this appeal that Holyfield made a prima facie showing of purposeful discrimination.  After strikes for cause, seven white women remained on the venire, and the government used five of its seven peremptory challenges to strike white women.  R-480 at 131, 136.

Notwithstanding, Holyfield failed to prove purposeful discrimination.  The government satisfied its burden under the second step of the Batson framework by proffering race-neutral and gender-neutral reasons for the contested strikes.  The government stated it struck potential jurors, Ms. Leser and Ms. Gerber, because they indicated during voir dire that they might question the veracity of a cooperating co-defendant's testimony,[6] it struck Ms. Dorfman because she had been the victim of credit card fraud committed by her son's friend, and it struck Ms. Chastain because she had a previous bad experience with the postal service.

---

[6] During voir dire, the government asked the following question: "If a co-defendant in this case who has pled guilty and is testifying in hopes of receiving more favorable treatment on his or her case, testifies, is there anybody who would not believe the testimony of – we often call them cooperating defendants simply because that person is expecting to gain some benefit for their testimony in their own pending sentencing hearing?"  R-480 at 84-85.  Ms. Gerber responded: "I might have some question about that," and Ms. Leser stated: "I would question it." Id. at 85.

Because the government proffered neutral explanations, the only remaining question for the district court was whether Holyfield carried his burden in proving purposeful discrimination. To answer this question, the district court was required to assess the credibility of the government's explanations. Miller-El v. Cockrell, 537 U.S. 322, 338-39 (2003). The district court gave Holyfield the opportunity to respond to the government's explanations before it ruled on the Batson objections. Holyfield argued below, as he does on appeal, that the government's reasons were pretexts for intentional discrimination. With regard to potential jurors Ms. Leser and Ms. Gerber, Holyfield claimed the government's explanation could not withstand constitutional scrutiny because the jurors merely stated that they would do what the district court judge would ultimately instruct them to do.

The district court did not find Holyfield's arguments persuasive, nor do we. Prosecutors are entitled to strike potential jurors for any constitutionally valid reason, and the government's reasons were supported by the facts of this case. Further, Holyfield has not identified anything about the circumstances of this case which would suggest the government would want to intentionally prevent white women from being seated on the jury. In light of the facts of this case and the deference we accord a district court when it makes credibility determinations, we do not find the district erred when it overruled Holyfield's Batson objections.

**2. Admission of Ross' Testimony**

Thomas, Holyfield, and Tefera argue the district court abused its discretion when it permitted Douglas Ross to testify as a lay witness and admitted spreadsheets prepared by Ross as records of regularly conducted activity. We find Ross' spreadsheets and corresponding testimony was inadmissible hearsay and admission of such testimony was an abuse of discretion. Thus, we do not reach the issue of whether Ross' testimony was expert testimony.

The government offered Ross' testimony to prove that specific bank account debit cards were used to purchase specific postal money orders. Ross prepared spreadsheets that identified which postal money orders were purchased with a particular debit card. Ross obtained information contained in the spreadsheets from a database called SURDA, which he helped to create when he worked as a contractor for the post office. SURDA collects and stores two types of information: (1) information regarding money orders sold at post offices across the country, including the date of the transaction, the location of the post office where the transaction occurred, and the clerk who conducted the transaction, and (2) information regarding debit and credit card transactions for postal money order purchases, including the date of the transaction, the location of the post office where the transaction occurred, and the clerk who conducted the transaction.

11

SURDA receives this information via electronic feeds from the financial application that the postal service uses and an external company that consolidates debit transactions for the postal service. To identify which postal money orders were purchased with a particular debit card, Ross matched debit card information and postal money order information contained in SURDA and added the purchase amounts of consecutively numbered money orders. Ross personally created the spreadsheets to reflect his findings.

Over defense hearsay objections, the district court admitted the spreadsheets prepared by Ross as records of regularly conducted business activity. The district court determined Ross was a proper witness to testify about the foundation for the spreadsheets. Further, the district court concluded that information contained in the spreadsheets constituted post office business records, and the spreadsheets were admissible as a "data compilation" of post office business records pursuant to Rule 803(6). Rule 803(6) states the following is not excluded by the hearsay rule, even though the declarant is available as a witness:

> Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the

> regular practice of that business activity to make
> the memorandum, report, record or data
> compilation, all as shown by the testimony of the
> custodian or other qualified witness, or by
> certification that complies with Rule 902(11), Rule
> 902(12), or a statute permitting certification,
> unless the source of information or the method or
> circumstances of preparation indicate lack of
> trustworthiness. . . .

"Rule 803(6) requires that both the underlying records and the report summarizing those records be prepared and maintained for business purposes in the ordinary course of business and not for purposes of litigation." United States v. Arias-Izquierdo, 449 F.3d 1168, 1183-84 (11th Cir. 2006).

The district court abused its discretion when it admitted the spreadsheets because some of the underlying records did not constitute post office business records, and the spreadsheets were prepared for this litigation. Debit card information contained in Ross' spreadsheets was not created by Ross, Ross' company, or the post office. Instead, the information was originally created by banks, transmitted to a third-party who consolidated the information, and then transmitted to SURDA by a nightly electronic feed. Ross did not know how the third-party created or maintained the information. Even if records contained in SURDA constituted post office business records, the records were the result of multiple levels of hearsay for which there was no foundation. See United States v.

13

Bueno-Sierra, 99 F.3d 375, 379 n. 10 (11th Cir. 1996)(Rule 803(6) does not eliminate double hearsay problems).

Moreover, the spreadsheets were not admissible as a data compilation under Rule 803(6). Ross created the spreadsheets specifically for the investigation of this case, and the spreadsheets were not simple computer printouts of SURDA records. Instead, Ross personally created the spreadsheets after analyzing and reorganizing information he retrieved from SURDA. The government did not offer the underlying SURDA records into evidence or give opposing counsel the opportunity to inspect such records. The admission of Ross' spreadsheets and corresponding testimony was an abuse of discretion.

Notwithstanding, evidentiary errors are not grounds for reversal "unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." United States v. Arbolaez, 450 F.3d 1283, 1290 (11th Cir. 2006)(quoting United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir.1990)). As to all of Tefera's and Thomas' convictions we have no hesitation in finding Ross' testimony was harmless beyond a reasonable doubt. With regard to Holyfield, Ross' testimony was harmless as to Holyfield's convictions for Counts 1, 6, 7, 12, and 13, but

Ross' testimony was reversible error as to Holyfield's convictions for Counts 24 and 26.

Ross' testimony was harmless as to Tefera's convictions. The evidence against Tefera included the following: Head testified Tefera introduced Head to the idea of committing bank fraud, Brown testified Tefera drove Brown to the bank to open the Guilfoyle account and Tefera was present when Brown opened the account, and Tefera testified that he did not know about or participate in the bank fraud scheme. By testifying and denying knowledge or participation in the bank fraud scheme, Tefera impliedly denied guilt as to all of the counts for which he was convicted. The jury was entitled to conclude the opposite of Tefera's testimony was true and consider the opposite of the testimony as substantive evidence of Tefera's guilt. See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). When the stated evidence is viewed in light of supporting evidence in the record, there was sufficient evidence to support Tefera's convictions on Counts 1, 2, and 26 without Ross' testimony.[7] All of Tefera's convictions are affirmed.

---

[7] Tefera summarily asserts a Confrontation Clause argument. In accordance with our finding that Ross' testimony was harmless error, any Confrontation Clause violation does not justify reversal of Tefera's convictions. See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)(Confrontation Clause is subject to harmless error analysis).

Ross' testimony was harmless as to Thomas' convictions. The evidence against Thomas included the following: Smith testified that Thomas gave Smith documents to open the L.C. Financial bank account, instructed Smith on how to open the account, and drove Smith to the bank to open the account, Crosby identified Smith in a bank photograph, which shows the individual depositing a check drawn on a Bank of America customer's account into the Rogers & Associates bank account, and Thomas testified that she did not know about or participate in the bank fraud scheme and denied depositing the check into the Rogers & Associates account. Like Tefera, Thomas' testimony implied that she denied guilt as to all of the counts for which she was convicted; the jury was entitled to conclude the opposite. When the foregoing evidence is viewed in light of supporting evidence in the record, there was sufficient evidence to support Thomas' convictions on Counts 1, 14, 24, 26, and 30 without Ross' testimony.

Thomas argues her conviction on Count 24 must be reversed because there was no evidence that funds deposited into the account were unauthorized. This claim is without merit. Thomas testified that she was not the individual shown in a bank photograph depositing a check drawn on Mr. Rafa's Bank of America account into the Rogers & Associates account. The jury was entitled to conclude the opposite. In addition, a bank investigator testified without objection that none

16

of the check victims he talked to during the course of his investigation authorized any of the deposited checks, and specifically, Mr. Rafa did not issue the check deposited into the Rogers & Associates account. R-481 at 272, 286. Accordingly, all of Thomas' convictions are affirmed.

Ross' testimony was harmless as to Holyfield's convictions on Counts 1, 6, 7, 12, and 13, and Ross' testimony was reversible error as to Holyfield's convictions on Counts 24 and 26. The evidence against Holyfield included the following: Head's testimony that Holyfield was one of the organizers of the bank fraud scheme who provided fake identification to co-conspirators, and Head saw Holyfield at Amuah's residence on several occasions, evidence that Holyfield used a debit card issued to the MTLA Electric, Inc. account to withdraw money from an ATM, evidence that Holyfield used a debit card issued to the Neeley Computer Services account and an identification with Eric Neeley's name and Holyfield's picture to make a purchase at World of Wheels, evidence that Eric Neeley's identity was used to commit bank fraud on the Neeley Computer Services account, and evidence that the identity of Peter Cranston was stolen by Moon and used to create a counterfeit check deposited into the MTLA Electric, Inc. account.

The totality of the evidence without Ross' testimony supports Holyfield's convictions on Counts 1, 6, 7, 12, and 13. Holyfield argues his bank fraud

17

convictions cannot stand because the only evidence of his involvement involved his receipt of fraudulent funds. Holyfield claims the crime of bank fraud was complete at the time that counterfeit checks were deposited into the bank accounts, and therefore, Holyfield's receipt of funds from the accounts did not aid and abet the commission of the bank fraud. We agree that bank fraud was complete at the time that checks were deposited into the bank accounts with the intent to eventually withdraw the funds for personal use. See United States v. Gregg, 179 F.3d 1312, 1315 (11th Cir. 1999). Notwithstanding, the totality of the evidence supports Holyfield's convictions. Based on testimony that Holyfield organized the bank fraud scheme and generally participated by providing fake identification, any reasonable jury could have concluded that Holyfield received funds from the MTLA Electric, Inc. and Neeley Computer Services accounts because Holyfield aided and abetted bank fraud for these accounts. We affirm Holyfield's convictions on Counts 1, 6, 7, 12, and 13.

However, we cannot say that Ross' testimony was harmless as to Holyfield's convictions for Counts 24 and 26. Unlike Tefera and Thomas, Holyfield did not testify. The only evidence that specifically linked Holyfield to the bank accounts charged in Counts 24 and 26 regarded evidence that Holyfield used money orders purchased with funds from the accounts. Without Ross'

18

testimony, there was no way to link the postal money orders to specific funds or specific bank accounts. We reverse Holyfield's convictions on Counts 24 and 26.

Based on the foregoing, all of Tefera's and Thomas' convictions are affirmed. Holyfield's convictions on Counts 1, 6, 7, 12, and 13 are affirmed, and Holyfield's convictions on Counts 24 and 26 are reversed. We remand for re-sentencing of Holyfield accordingly.

**3. Moon's Sentence**

Moon claims the district court clearly erred when it enhanced Moon's sentence for sophisticated-means and failed to apply a mitigating-role reduction. Moon argues his conduct did not involve sophisticated-means because he merely provided customer account information to other individuals in exchange for payment, and there was no evidence that he knew the co-defendants or the breadth of the co-defendants' conduct. Further, Moon contends he was entitled to a mitigating-role reduction because his conduct was not instrumental to the bank fraud, he was less culpable than his co-defendants, and he was the least compensated co-defendant.

Pursuant to the Supreme Court's decision in United States v. Booker, 543 U.S. 220, 264 (2005), the Sentencing Guidelines are no longer mandatory. Although the Guidelines are only advisory, a district court must calculate the

19

advisory sentencing range correctly and must consider it when determining a defendant's sentence. United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005).

The Guidelines state that two levels are added to a defendant's base offense level if the offense involved "sophisticated means." U.S.S.G. § 2B1.1(b)(9)(C). Sophisticated means is defined as:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1, comment. (n.8(B)).

In this case, the district court did not clearly err when it increased Moon's offense level for sophisticated means. Foremost, Moon's role in providing account information was critical to the bank fraud scheme for the accounts Moon was held accountable for. Not only did Moon provide necessary customer account information to his co-conspirators, but the evidence further indicates that Moon intentionally selected dormant accounts that had substantial lines of credit.

20

Moon's claim that he did not know his co-conspirators were using the account information to commit bank fraud is unavailing. Moon sold the information in exchange for a promised Mercedes Benz. In addition, on at least one occasion, Moon accepted a counterfeit check for deposit from co-conspirators Smith and Crosby after other bank tellers rejected the deposit. The evidence indicates Moon knew the check was counterfeit when he accepted the deposit. In light of the sophisticated nature of the overall scheme and Moon's unauthorized use of customer bank account information, we are not left with a "definite and firm conviction" that the district court committed a mistake when it enhanced Moon's sentence for sophisticated means. See Robertson, 493 F.3d at 1330.

Nor do we find the district court clearly erred when it failed to apply a mitigating-role reduction to Moon's sentence. A defendant bears the burden of proving he played a minor role in the offense by a preponderance of the evidence. Rodriguez De Varon, 175 F.3d at 939. A defendant's offense level may be reduced if the defendant's role in the offense "makes him substantially less culpable than the average participant." U.S.S.G. §3B1.2, comment. (n.3(A)). To receive a two-level minor-role reduction, the defendant must prove he is less culpable than "most other participants." Id., comment. (n.5). To determine whether the defendant is entitled to a mitigating role-reduction, the district court

21

must consider two factors: (1) the defendant's role compared with the relevant conduct for which he was held accountable at sentencing, and (2) the defendant's role compared with the role of other participants in the relevant conduct. Rodriguez De Varon, 175 F.3d at 945.

As discussed above, Moon's role in this case was essential to the bank fraud for the counts Moon was held accountable for, and on at least one occasion, Moon's participation included accepting a counterfeit check for deposit. Moon's argument that customer information was obtained through other means is not supported by the record with regard to the counts Moon was held accountable for. Although Moon was apparently the least compensated co-conspirator, he initially provided customer account information under the assumption that he would receive a Mercedes Benz as payment. Due to the necessity of Moon's role in compromising the bank accounts, his knowledge of the conspiracy, and Moon's expected compensation, the district court did not clearly err in denying Moon a mitigating-role reduction. Accordingly, we affirm Moon's sentence.

## CONCLUSION

Holyfield's convictions on Counts 24 and 26 are reversed; the remainder of Holyfield's convictions are affirmed. We remand for re-sentencing of Holyfield

22

accordingly. We affirm the convictions and sentences of Thomas, Tefera, Moon, and Beinvenu.